*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0124P (6th Cir.)
File Name: 04a0124p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

JOHN DAVID STUMPF,
      *Petitioner-Appellant,*

    *v.*       No. 01-3613

BETTY MITCHELL, Warden,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 96-00668—George C. Smith, District Judge.

Argued: December 11, 2002

Decided and Filed: April 28, 2004

Before: BOGGS, Chief Judge; and DAUGHTREY and
MOORE, Circuit Judges.

————————

## COUNSEL

**ARGUED:** Alan M. Freedman, MIDWEST CENTER FOR JUSTICE, Chicago, Illinois, for Appellant. Carol Ann Ellensohn, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Alan M. Freedman, Carol Heis, MIDWEST CENTER FOR JUSTICE, Chicago, Illinois, for Appellant. Stephen E. Maher, OFFICE

OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

DAUGHTREY, J., delivered the opinion of the court, in which MOORE, J., joined. BOGGS, C. J. (pp. 44-52), delivered a separate dissenting opinion.

————————

## OPINION

————————

MARTHA CRAIG DAUGHTREY, Circuit Judge. The petitioner, John David Stumpf, is a state prisoner incarcerated on Ohio's death row. He appeals the district court's dismissal of his habeas corpus petition, filed pursuant to 28 U.S.C. § 2254, in which he challenged his 1984 guilty plea and death sentence for one count of aggravated murder, with the capital specification that the murder was committed to escape detection, apprehension, trial, and punishment for other offenses, including aggravated robbery and attempted aggravated murder. Specifically, Stumpf alleges (1) that his guilty plea was involuntary and unknowing; (2) that his due process rights were violated by the state's use of inconsistent theories to secure convictions against both Stumpf and his accomplice, Clyde Wesley; (3) that he was deprived of effective assistance of counsel at sentencing; and (4) that the Ohio death penalty statute is unconstitutional on its face and as applied to him.

Prior to entering a guilty plea, Stumpf had waived his right to a trial by jury and elected to have his case heard by a three-judge panel. Under Ohio law, when a defendant pleads guilty to aggravated murder, the court must hold an evidentiary hearing to establish a factual basis for the plea. The three-judge panel held such a hearing in this case and found that there was a factual basis for Stumpf's plea, that he was guilty of aggravated murder with the capital specification and,

ultimately, that there was insufficient mitigating evidence to spare Stumpf from imposition of the death penalty.

Under Ohio law at the time of Stumpf's conviction, the aggravated murder statute required that "specific intent" be proved to convict someone of that crime. At the evidentiary hearing to establish a factual basis for Stumpf's plea, Stumpf and his attorneys argued that he did not shoot the victim and, indeed, that he was not present when the victim was shot. The state argued in response that Stumpf was the shooter, and the three-judge panel that heard the case adopted the state's theory, finding that Stumpf was the actual shooter. At a later trial of Stumpf's accomplice Wesley, however, the state presented the testimony of a jailhouse informant to establish that Wesley was the shooter. When Stumpf sought to withdraw his guilty plea on the basis of Wesley's conviction, the state opposed his motion, arguing that the informant's testimony was unreliable.

We conclude that the district court should have granted relief to Stumpf on either or both of two alternative grounds: first, that his guilty plea was unknowing and involuntary because he was manifestly not aware that specific intent was an element of the crime to which he pleaded guilty and, second, that Stumpf's due process rights were violated by the state's deliberate action in securing convictions of both Stumpf and Wesley for the same crime, using inconsistent theories. Because we are granting relief on these two grounds, we do not reach Stumpf's challenge to the effectiveness of counsel's representation at sentencing or to the constitutionality of the Ohio death penalty statute.

## I. *PROCEDURAL AND FACTUAL BACKGROUND*

### A. The District Court's Factual Findings

Most of the underlying facts are undisputed in this case and do not affect the legal determinations necessary to the resolution of the appeal. For that reason, and because we

review the district court's determination of the facts only for clear error, we adopt the district court's characterization of the facts, as determined by the state courts, as follows:

On May 14, 1984, Stumpf, Clyde Daniel Wesley, and Norman Leroy Edmonds, after visiting a bar in Washington, Pennsylvania, got on Interstate 70 and headed west toward Ohio. By sundown, they had reached Guernsey County. They stopped their car along I-70 and, leaving Edmonds in the car, Stumpf and Wesley walked to a nearby house under the pretense of needing to make a phone call. The house they chose was owned and occupied by Norman and Mary Jane Stout. Stout admitted Stumpf and Wesley into his home and allowed them to use the phone. When they had completed the call, both Stumpf and Wesley produced pistols and announced a robbery.[1] Stumpf held the Stouts at gunpoint in a back bedroom while Wesley searched the house for items to steal.

At some point, Stout moved toward Stumpf, and Stumpf shot him between the eyes with his pistol. The shot was not fatal, and Stout subsequently pushed Stumpf into the next room. During this altercation, Stout was struck on the head with a pistol and shot in the head a second time. These actions were enough to render him semi-conscious but not to kill him. While lying on the floor in the other room, Stout heard four gunshots. There is no dispute that Mary Jane Stout was shot and killed during the course of this robbery, although there is a dispute as to whether Stumpf or Wesley fired the fatal shots. After Mrs. Stout was killed, Stumpf and Wesley stole the Stout's car and fled. Stumpf was arrested several days later, and after initially denying any

---

[1] Wesley and Stumpf had carried Edmonds's chrome Raven and Wesley's black .25 caliber pistol with them into the house.

knowledge about these crimes and then being told that Stout had survived, he confessed to being involved.

At the time the trial court proceedings occurred, Wesley had not yet been extradited from Texas. However, subsequent to Stumpf's having pleaded guilty and having been sentenced to death, Wesley was convicted of aggravated murder by a jury and received a sentence of life imprisonment without the possibility of parole for 20 years. The State introduced evidence at Wesley's trial that Wesley and not Stumpf fired the shots that killed Mrs. Stout. Edmonds was not charged in the Stout murder and robbery, but was charged for other offenses committed during this crime spree, and he agreed to and did testify against both Stumpf and Wesley concerning the murder of Mary Jane Stout.

*Stumpf v. Anderson*, No. C-1-96-668 (S.D. Ohio Nov. 9, 1999).

## B. Additional Facts Regarding Ballistics Evidence

Of the two bullets that struck Stout, only pieces of each were recovered. Part of the bullet that struck him between the eyes was recovered during surgery, while a second fragment was found in the second bedroom. A portion of the bullet that struck Stout in the top of the head was recovered during surgery, but part of it had to be left in place. Another bullet was recovered from the mattress of the second bedroom.

Stout's wife was shot four times in the first bedroom. She died from three gunshots to the left side of her head. The fourth bullet went through her left wrist and struck her chest without penetrating the skin of her chest. A fifth bullet was recovered from the wall of that bedroom, above the headboard of the bed.

The chrome Raven was never recovered by the police, and Stumpf admitted that he had thrown it out of the car window

after he and Wesley had left the Stout residence. The black .25 caliber pistol was recovered by the police after the men sold it, along with one of Stout's guns, to an individual in Washington, Pennsylvania. Ronald Dye, a ballistics expert from the Ohio Bureau of Criminal Identification and Investigation, a division of the Ohio Attorney General's office, testified at Stumpf's factual basis hearing as to the forensic findings regarding bullets and cartridge cases recovered from the murder scene. Dye testified that there were eight spent cartridges found at the scene, that seven of them had been fired by one gun, and one was fired by a different gun. Dye also said that the black pistol, which had been recovered by the police, fired one bullet, while the other seven bullets were all fired by the same gun. That gun could have been the chrome Raven, or one of several other types of guns.

At Stumpf's plea proceeding, the prosecutor argued that the ballistics evidence supported the conclusion that Stumpf had shot Mrs. Stout, since she was apparently shot with the same weapon used against her husband, saying, "There's ample evidence to conclude that this defendant fired all shots that hit anybody, because the same gun fired all of those shots." However, during Wesley's trial, the same prosecutor put Eastman, Wesley's cellmate, on the witness stand, to repeat Wesley's confession to him. According to Eastman, Wesley told him that after Stumpf had shot Stout in the face, he dropped the chrome Raven and ran, at which point Wesley picked up the pistol and shot Mrs. Stout. This version of the crime was also supported by the ballistics evidence that the black pistol had a tendency to jam after firing just one round, which may have led Wesley to discard it after shooting it only once.

## C. The Guilty Plea

Stumpf and Wesley could not be tried together because Wesley contested his extradition from Texas, where he had been apprehended. As a result, while Wesley was still

detained in Texas, Stumpf pleaded guilty to the aggravated murder of Mary Jane Stout, in violation of Ohio Rev. Code § 2903.01(B), and to the capital specification under Ohio Rev. Code § 2929.04(A)(3) that the murder was committed for the purpose of escaping detection, apprehension, trial or punishment for the offenses of the aggravated robbery of the Stouts. He also pleaded guilty to the attempted aggravated murder of Norman Stout and to a firearms specification for each count. Subsequent to the entry of his plea, the prosecutor notified the trial judge that a plea agreement had been reached. Stumpf was questioned about the agreement at some length, as detailed below.

## D. The Evidentiary Hearing

Under Ohio law, the trial court must conduct an evidentiary hearing in all aggravated murder cases involving guilty pleas, to determine whether there is a factual basis for the plea. Following Stumpf's entry of a waiver to have a jury hear the evidence, the hearing commenced before a three-judge panel.

During the factual basis hearing, the prosecution argued that Stumpf had shot Mrs. Stout, while the defense argued that Mrs. Stout was shot by Wesley, not by Stumpf. The three-judge panel found Stumpf "guilty beyond a reasonable doubt" of count one of the indictment (aggravated murder of Mary Jane Sout), along with specification one (that she was killed to escape detection for the crimes of aggravated robbery and attempted aggravated murder) and specification four (firearm), and guilty of count two of the indictment (attempted aggravated murder of Norman Stout), with its firearm specification.

## E. The Mitigation Hearing

The mitigation hearing was held one day after the conclusion of the evidentiary hearing, lasted less than two days, and consisted of the presentation of 15 witnesses for the defense – primarily some of Stumpf's friends and family members and a few former employers and teachers – and of an unsworn statement by Stumpf himself. Defense counsel presented no expert witnesses, beyond a parole officer and a court clerk who testified as to Stumpf's lack of a significant criminal history. The general defense strategy was to show that Stumpf had a generally good nature, lacked a violent temper, had a fairly steady work history but a limited education, had a difficult home environment, and was respectful towards women. Stumpf's unsworn statement recounted his version of the crime and emphasized that Wesley, and not Stumpf, had shot Mary Jane Stout.

Following the hearing, the three-judge panel sentenced Stumpf to death, finding that he had established only two mitigating factors: his age (23) and his lack of a significant criminal background.

## F. Appellate Procedural History

After Stumpf's conviction, and while his direct appeal was pending, Clyde Wesley was also convicted, by a jury, of Mary Jane Stout's murder. As a result, Stumpf filed a motion for leave to withdraw his guilty plea or, in the alternative, to have the trial court set aside his death sentence and grant him a new sentencing hearing. The motion was summarily denied by two of the three judges who had heard his case at the trial level (the third judge had died in the interim), and the Ohio Supreme Court affirmed the order at the same time it affirmed Stumpf's conviction on direct appeal.

Stumpf then filed a petition for post-conviction relief in state court, raising challenges to the validity of his jury trial waiver and the effectiveness of trial counsel's representation, particularly with regard to counsel's advice to Stumpf that he would not receive the death penalty if he pleaded guilty. In the petition, Stumpf requested an evidentiary hearing and submitted multiple affidavits in support of his claims. The trial court dismissed the petition without an evidentiary hearing, and this decision was affirmed by the Ohio Court of

Appeals. The Ohio Supreme Court dismissed the appeal, *see State v. Stumpf*, 560 Ohio St. 3d 712(1990), and the United States Supreme Court subsequently denied certiorari. *See Stumpf v. Ohio*, 502 U.S. 956 (1991).

Stumpf next filed a petition for a writ of habeas corpus in federal court, alleging as grounds for relief that the Ohio Death Penalty statute is unconstitutional, both as written and as applied to Stumpf; that his guilty plea was not knowing and intelligent; that his waiver of the right to a jury trial was invalid; that he received ineffective assistance of counsel at the penalty phase; that he was not permitted to be present at his motion for a new trial; that the trial court improperly considered non-statutory aggravating circumstances and ignored substantial mitigating evidence when deciding his sentence; that the trial court erred in denying his motion to vacate his sentence or withdraw his guilty plea based on newly discovered evidence; that consideration of post-sentence proceedings by less than the entire three-judge panel violated his due process rights; and that the trial court erred by failing to follow an Ohio statutory requirement that the court produce a meaningful written analysis of the mitigation evidence as a basis for imposing a death sentence.

The district court issued two opinion and orders. The first found that several of petitioner's claims had been procedurally defaulted, *see Stumpf v. Anderson*, No. C-1-96-668 (S.D. Ohio Nov. 9, 1999); the second denied relief on the remaining claims, *see Stumpf v. Anderson*, No. C-1-96-668 (S.D. Ohio Feb. 7, 2001). However, the district court did grant a certificate of appealability on the following five issues: (1) whether the statutory provisions governing Ohio's capital punishment scheme violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, either on their face or as applied to Stumpf; (2) whether Stumpf's guilty plea was knowing, intelligent and voluntary; (3) whether Stumpf received the ineffective assistance of counsel at the penalty phase of his trial; (4) whether Stumpf's due process rights were violated when

the trial court failed to vacate his sentence or allow him to withdraw his plea based on newly discovered evidence; and (5) whether Stumpf received the ineffective assistance of appellate counsel. Before us, Stumpf has pressed the first four claims but has abandoned the claim that appellate counsel was ineffective.

## II. *STANDARD OF REVIEW*

Because Stumpf's federal habeas petition was filed in November 1995, the amendments to 28 U.S.C.§ 2254 contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) do not apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 336)(1997) (finding that AEDPA changes do not apply to cases pending at the time of AEDPA's enactment on April 24, 1996). Stumpf's claims, therefore, must be evaluated under § 2254(d) as it existed prior to the enactment of AEDPA.

Accordingly, we review the district court's disposition of a petition for writ of habeas corpus *de novo*, although the district court's factual findings are reviewed only for clear error. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). We also defer to the state court's factual findings, which may be rebutted only by "clear and convincing evidence." *Id*. However, this deference only applies to "basic, primary facts" and not to mixed question of law and fact, which are subject to *de novo* review. *Id*.

## III. *ANALYSIS*

### A. The Validity of the Petitioner's Guilty Plea

The Supreme Court has held, in *Boykin v. Alabama*, 395 U.S. 238 (1969), that when a defendant enters a guilty plea, the state bears the burden of showing that the plea was voluntary, intelligent and knowing. Determining whether a plea is voluntary, intelligent and knowing requires an analysis of the totality of the circumstances. *Garcia v. Johnson*, 991

F.2d 324, 326 (6th Cir. 1993). When a defendant brings a federal habeas petition challenging his plea, the state generally satisfies this burden by producing a transcript of the plea proceeding. *Garcia*, 991 F.2d 324, 326. A state court finding that the plea was proper is accorded a presumption of correctness, unless the transcript of the plea proceeding is inadequate to demonstrate that the plea was voluntary, intelligent and knowing. *Garcia* at 326-27; *Dunn v. Simmons*, 877 F.2d 1275, 1277 (6th Cir. 1989), *overruled on other grounds by Parke v. Raley*, 506 U.S. 20 (1992).

The proper standard of review in this case, then, turns on whether the record of state court proceedings surrounding Stumpf's guilty plea "leav[es] doubt as to whether the plea was in fact intelligent and voluntary." *Dunn v. Simmons*, 877 F.2d at 1277 (*citing Roddy v. Black*, 516 F.2d 1380, 1384 (6th Cir. 1975)). If the record does leave doubt as to whether the plea was voluntary, intelligent and knowing, and the defendant argues that it was not, the State bears the burden of proving the contrary. *Id*. (*citing Boykin v. Alabama*, 395 U.S. 238, 243 (1969).

Although Stumpf does not contend explicitly that his guilty plea was invalid because he was not aware that specific intent was an element of the crime to which he pleaded guilty, this argument is inherent in the fact that he continually professed his innocence of committing the actual shooting both during and after the guilty plea. The record reflects, for example, his expectation that he would be given an opportunity to present evidence to the three-judge panel relevant to his conduct." Moreover, the record indicates that the explicit statutory requirement of intent was never explained to Stumpf during the plea colloquy. Furthermore, although his attorneys represented to the court that they had explained to Stumpf the elements of the crime, their own arguments to the court during the plea colloquy and the evidentiary hearing to establish a factual basis for the plea refute the typical presumption that defense counsel have fully and adequately explained all elements of a crime to a client before he pleads

guilty. Indeed, defense counsel's representations to the court either betray their own ignorance of the intent element of aggravated murder, or represent a woefully inadequate understanding of the meaning of a guilty plea. Finally, the plea colloquy itself, along with Stumpf's statements to the court through all stages of the proceedings, demonstrates Stumpf's unwillingness to admit to intent.

At the time of Stumpf's crime and subsequent conviction, Ohio's aggravated murder statute specified that specific intent was a necessary element of aggravated murder. The statute read as follows:

§ 2903.01 Aggravated murder.

(A) No person shall purposely, and with prior calculation and design, cause the death of another.

(B) No person shall purposely cause the death of another while fleeing immediately after committing or attempting to commit kidnapping[sic], rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.

(C) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.

Ohio Rev. Code § 2903.01 (1984)(amended 1996).[2]

Stumpf was convicted under § 2903.01(B), which, although it specifies that the murder must be caused "purposely," does not specifically require intent. However, subsection (D) of the same statute clarifies that intent is indeed a necessary element of aggravated murder:

---

[2] Ohio Rev. Code § 2903.01 was amended on July 1, 1996. Section (D) was removed and replaced with additional descriptions of aggravated murder. *See* Ohio Rev. Code § 2903.01 (2002).

(D) No person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another . . . .

Ohio Rev. Code § 2903.01 (1984) (amended 1996). Furthermore, the statute limits fact-finders from inferring specific intent solely from an accused's participation in a felony murder:

[I]n no case shall a jury in an aggravated murder case be instructed in such a manner that it may believe that a person who commits or attempts to commit any offense listed in division (B) of this section is to be conclusively inferred, because he engaged in a common design with others to commit the offense by force and violence or because the offense and the manner of its commission would be likely to produce death, to have intended to cause the death of any person who is killed during the commission of or attempt to commit, or flight from the commission of or attempt to commit, the offense. If a jury in an aggravated murder case is instructed that a person who commits or attempts to commit any offense listed in division (B) of this section may be inferred, because he engaged in a common design with others to commit the offense by force or violence or because the offense and the manner of its commission would be likely to produce death, to have intended to cause the death of any person who is killed during the commission of, attempt to commit, or flight from the commission of or attempt to commit the offense, the jury also shall be instructed that the inference is nonconclusive, that the inference may be considered in determining intent, that it is to consider all evidence introduced by the prosecution to indicate the person's intent and by the person to indicate his lack of intent in determining whether the person specifically intended to cause the death of the person killed . . . .

Ohio Rev. Code § 2903.01(D) (1984)(amended 1996). Finally, the fact-finder must also be instructed that "the prosecution must prove the specific intent of the person to have caused the death by proof beyond a reasonable doubt." Ohio Rev. Code § 2903.01(D) (1984) (amended 1996). Read together, these provisions indicate that specific intent may not be inferred solely from the fact of participation in a felony murder but must be established explicitly by the prosecution.

Ohio courts have confirmed this interpretation of the statute. In *In re Washington*, 691 N.E.2d 285, 287 (1998), the Supreme Court of Ohio considered an appeal regarding whether there was sufficient evidence to support the specific intent requisite for an aggravated murder conviction, in a case in which the murder was committed in the course of a robbery. As the court explained: "Washington cannot [be found guilty of] aggravated murder based solely on his complicitous actions. It is also necessary for the state to establish that Washington acted with the kind of culpability required of the commission of aggravated murder." *In re Washington*, 691 N.E.2d at 286. In this particular case, the court found that there was sufficient evidence for the trial court to conclude that Washington had acted with the requisite intent, because the trial court inferred intent only after "hearing and considering all the evidence" instead of presuming intent based on Washington's participation in the robbery. *In re Washington*, 691 N.E.2d at 288.

Here, the record of the plea proceeding clearly demonstrates that the defendant did not possess an understanding of the aggravated murder charge to which he pleaded guilty. Although the district court ultimately concluded that the state court record was suggestive of a knowing and voluntary plea, it did concede that the plea proceeding was "not a picture of clarity." We agree, and we note that this "lack of clarity" first surfaced at the moment the prosecutor informed the court that a plea agreement had been reached. He gave the following account of the agreement:

SCOTT: Your Honor, the first matter that would be dealt with or the State would ask leave of Court pursuant to Criminal Rule 7 (D) and Ohio Revised Code Section 2941.30 to amend by interlineation specification one to the first count of the Indictment in order that it may read as follows: The Grand Jurors further find and specify under Ohio Revised Code Section 2929.04(A)(3) in compliance with Ohio Revised Code Section 2941.14 that the aforesaid offense being the offense charged in the first court, the Aggravated Murder, was [committed] for the purpose of escaping detection, apprehension, trial or punishment for other offenses – the words, "other offenses" are the first change, committed by the above named John David Stumpf, to wit: Aggravated Robbery and then we're adding the language "and Attempted Aggravated Murder". If that amendment is granted, the defendant then would enter a plea of guilty to the first count contained in the Indictment, being the Aggravated Murder count and a plea of guilty to specification one to the first count as amended; would also enter a plea of guilty to the second count in the Indictment, being the offense of – excuse me, back up. As to the first count he would also enter a plea of guilty to specification four to the first count. So, he will be pleading to the first count, the amended specification one to the first count and specification four to the first count. With regard to the second count, being the Attempted Aggravated Murder, he would enter a plea of guilty to the Attempted Aggravated Murder and a plea of guilty to the specification to the second count. If the pleas of guilty to the two counts and the specifications I've mentioned are accepted by the Court, the Court would then proceed under Criminal Rule 11(c)(3) to determine if there is a factual basis for the plea of guilty to the Aggravated Murder charge and the existence of the aggravating circumstances and if the pleas are accepted the State would then ask leave to enter a nolle pros as to specifications two and three to the first count and also a nolle pros as to the third, fourth and fifth counts in the

Indictment and including the specification to the third count.

That is my understanding of the arrangement that we are proposing to the Court at the present time.[3]

Reviewing this portion of the trial court record, the district court commented that "the prosecuting attorney's explanation of the plea agreement was somewhat difficult to follow, and that criminal defendants in such situations will often answer questions posed by the trial court without a clear understanding of each and every term uttered – especially if advised by counsel to do just that." But the trial court in this case, rather than attempting to elucidate the prosecutor's explanation for the defendant, immediately turned to the defendant for verification of the prosecutor's account of the plea agreement. As the record reveals, even at this stage in the plea agreement, the defendant appeared to be unable to follow the proceedings:

JUDGE HENDERSON: Thank you, Scott. Before ruling on the motion or amendment of the Indictment, I would ask Counsel for the defense if they wish to comment upon the statement of the Prosecutor. Tingle?

TINGLE: If the Court please, the statement made by the Prosecuting Attorney is an accurate statement based upon our discussions with him earlier today and one upon which we are ready to proceed at this time.

JUDGE HENDERSON: I'm going to ask the Counsel for the defendant to inform the defendant that I am going to ask one question of the defendant very shortly and that question is this: Do you, John David Stumpf, affirmatively acknowledge the agreement that has been

---

[3]The plea agreement also merged specification four of count one, and specification one of count two. That is, both gun specifications were to be treated as part of the same offense for sentencing purposes.

stated by the Prosecutor and concurred in by the defendant's counsel? Having forewarned the defendant of the question that is to be asked, I'm going to ask that question now.          Stumpf, do you affirmatively acknowledge this agreement?

STEPHENS: Would you repeat the question for him Your Honor?

JUDGE HENDERSON:  Stumpf, do you affirmatively acknowledge the agreement that has been stated by the Prosecutor and concurred in by your attorneys?

THE DEFENDANT:  Yes, sir.

Obviously, not every ambiguity in a plea proceeding, without more, will demonstrate that a plea is not "knowing and intelligent." However, the exchange set out above turned out to be merely the beginning of much confusion that was to follow. After allowing amendment of the indictment, the court conducted a plea colloquy, examining first the defense attorneys, and then the defendant:

JUDGE HENDERSON:  The Indictment seems to be in order and the Court is going to make certain inquiries of the counsel for the defendant and the defendant as to the proposed entry of the guilty plea. It is necessary that question be asked and answers thoughtfully given in a case of this sort. I'm going to inquire of the attorneys for the defendant, have you fully investigated the facts and the law of this case and determined whether there exists any question of the admissibility of any claimed admissions, confessions or other evidence under Federal and State law and advised your client concerning the same?

TINGLE: We have, Your Honor.

JUDGE HENDERSON:  Have you informed your client of the elements of the offenses with which he is charged, of all defenses which may be available to him and of all of his Constitutional rights, both State and Federal?

TINGLE:  Yes, we have.

After his attorneys indicated that they had explained the elements of the crime to their client, Stumpf was sworn in for the limited purpose of answering questions concerning his guilty plea, and affirmed his attorney's statements, as follows:

JUDGE HENDERSON:  Stumpf, I'm going to ask you a number of questions and if you do not understand those questions you may inquire of your attorneys to better able you to understand everything that is being asked you. These have to do with the rights that you have as a person who has been accused of a crime. Do you understand that you have a constitutional privilege against self-incrimination?

THE DEFENDANT:  Yes, sir.

JUDGE HENDERSON:  With a full understanding that anything that you say may be used against you, are you willing then to answer questions with regard to your understanding of your rights?

THE DEFENDANT:  Yes, sir.

JUDGE HENDERSON:  Now, you heard the questions that I put to your attorneys, I believe, relative to their advice to you and their counseling of you, did you not?

THE DEFENDANT:  Yes, sir.

JUDGE HENDERSON:          Do you personally acknowledge that your attorneys have informed and advised you as they say they have?

THE DEFENDANT: Yes, sir.

JUDGE HENDERSON: Are you satisfied with the services which they have performed for you?

THE DEFENDANT: Yes, sir.

Judge Henderson next questioned Stumpf as to his physical and mental health, and whether he was presently under the influence of drugs or alcohol. He then went over the crimes to which Stumpf was pleading guilty. The following is a complete account of his explanation to the defendant:

JUDGE HENDERSON: Do you understand that you are charged with several offenses? The first offense being that of Aggravated Murder, that there have been two specifications being presented at this time in this particular proceedings, to wit: Aggravated Robbery and Attempted Murder and possession of a firearm while committing those offenses. Do you understand that?

THE DEFENDANT: Yes, sir.

JUDGE HENDERSON: Do you understand also that you have been charged with the offense of Attempted Aggravated Murder, which is a felony in the first degree?

THE DEFENDANT: Yes, sir.

JUDGE HENDERSON: For the first count, which is that of Aggravated Murder, you are subject to the following penalties: you are subject to being – to a sentence of twenty years without probation, that is, a sentence of life without probation for twenty years; a sentence of life without probation for a period of thirty years and the death penalty by electrocution could be imposed against you. Do you understand that, sir?

THE DEFENDANT: Yes, sir.

JUDGE HENDERSON: Do you understand also that you would be subject under the – under specification four to the first count to three years incarceration before you begin to serve any other sentence?

THE DEFENDANT: Yes, sir.

JUDGE HENDERSON: Do you understand also that the Attempted Aggravated Murder, which is set forth in count two, is a felony in the first degree and that you could be sentenced to be incarcerated for a period of four, five, six or seven but not more than twenty-five years? Do you understand that, sir?

THE DEFENDANT: Yes, sir.

JUDGE HENDERSON: Do you understand also that for a felony of the first degree that you could be fined not more than $10,000.00?

THE DEFENDANT: Yes, sir.

JUDGE HENDERSON: And that you could receive both the fine and the incarceration, which I have mentioned?

THE DEFENDANT: Yes, sir.

JUDGE HENDERSON: Are you presently on probation or parole, sir?

THE DEFENDANT: No, sir.

As indicated below, Stumpf has a low IQ and has been found to be mentally and emotionally immature. Nevertheless, the trial court never inquired into Stumpf's ability to understand the guilty plea proceedings or the nature of the charges against him. The explanation set out above is the only account of the crimes provided to Stumpf by the

court. Nowhere does the court explain the elements, or even read the charges as listed in the indictment.[4]

Judge Henderson then proceeded to question Stumpf about the rights he was surrendering by pleading guilty. The exchange went as follows:

JUDGE HENDERSON: Do you understand that if you plead guilty you will waive, that is, you will give up the right to a jury trial or trial by the Court; the right to be presumed innocent and until proved guilty beyond a reasonable doubt; the right to confront and to question the witnesses against you and to have compulsory process for obtaining witnesses in your favor; the right to remain silent or to testify at your trial as you may choose and that no inferences may be drawn if you choose not to testify at your trial. Do you understand that you may be giving up those rights?

STEPHENS: Your Honor, with reference to that, we have explained that to the defendant. *He was going to respond but we have informed him that there is, after the plea, a hearing or trial relative to the underlying facts so that he is of the belief that there will be presentation of evidence* and I wanted to make that clear to the Court with reference to his right of waiver of trial to Court.

JUDGE HENDERSON: I understand that and I appreciate your bringing that to my attention, Stephens. Of course *in the sentencing portion of this trial you do have those rights to speak in your own behalf to present*

[4] Stumpf did initial the interlineation amendment to the indictment during the plea hearing, but there is no indication in the record that he had actually read the indictment at any point or that it had been read to him. Moreover, we conclude that use of the term "purposely" is not sufficient to put the defendant on notice that specific intent, which is expressly more than intent implied from participation in a felony, is a required element of aggravated murder.

*evidence and testimony on your own behalf.* My statement to you and my question to you was intended to except those rights that you do have. Counsel, is that satisfactory?

STEPHENS: Yes, sir.

We read this exchange to reflect a misunderstanding between attorney Stephens and Judge Henderson. Stephens, answering for Stumpf, asserted the defendant's right to present evidence during "a hearing or trial relative to the underlying facts" of the case. He was plainly referring to the factual basis hearing and asserting the defendant's wish to challenge the state's version of the facts. Judge Henderson indicated in response that the defendant could present evidence during "the sentencing portion of this trial," apparently referring to the mitigation phase. In any case, this was the first indication that the defendant did not wish to concede the state's version of the facts. The parties next discussed a prior suppression hearing, and then the court resumed questioning Stumpf:

JUDGE HENDERSON: Do you understand, Stumpf, that if any promises or inducements have been made to you by any person to cause you to plead guilty that they are not binding upon the Court, that if you plead guilty that Court, this panel of Judges, will decide your sentence after considering all of the evidence that is to be presented and evidence in mitigation of punishment and after considering a presentence investigation, report and recommendation approved and prepared by the probation department and that you may receive the maximum sentence prescribed by law. Do you understand that, sir?

THE DEFENDANT: Yes, sir.

JUDGE HENDERSON: Have any promises or inducements been made to you, sir, other than the

agreement which you have affirmatively acknowledged on the record?

THE DEFENDANT: No, sir.

JUDGE HENDERSON: Are you in fact guilty of count one with specification one and specification four?

 STEPHENS: One moment, Your Honor. *Your Honor, the defendant has asked me to explain his answer. His answer in yes. He will recite that with obviously his understanding of his right to present evidence at a later time relative to his conduct, but he'll respond to that.*

JUDGE HENDERSON: At no time am I implying that the defendant will not have *the right to present evidence in mitigation hearing* and I do appreciate it, Stephens, that you bring this to the attention of the Court. And I'm going to ask that the defendant, himself, respond to the question that I asked with that understanding that he has the right to present evidence in mitigation. I'm going to ask the defendant if he is in fact guilty of the charge set forth in Count one, including specification one and specification four?

The Defendant: Yes, sir.

Again, the exchange between Stephens and Judge Henderson has all the hallmarks of a serious misunderstanding. Stumpf was unwilling to plead "guilty" without expressly reserving his right to present evidence "relevant to his conduct." Read with the preceding reference to presenting evidence, this could only refer to the subsequent evidentiary hearing to establish a factual basis for the plea. Stumpf, obviously, was reiterating his desire to challenge the state's account of his actions, and had the procedure called for an immediate determination of the evidence relied upon by the state to support the defendant's imminent conviction, the misunderstanding would undoubtedly have come to light

before the plea was finalized and Stumpf's fate was sealed. Once again, however, Judge Henderson referred to the defendant's "right to present evidence in mitigation hearing," completely missing the clear implication that despite his admission of guilt, Stumpf was concerned about preserving his ability to contest the state's account of his actions.

Moreover, defense counsel's arguments during the subsequent evidentiary hearing confirm the defendant's desire to contest the state's version of the crime. From the opening statement at that hearing, counsel argued that Wesley, not Stumpf, was the one who shot Mary Jane Stout. For example, defense counsel's opening statement included the following:

[T]he scenario as outlined by Scott [the prosecutor] does follow the sequence of events as they did occur, except for the statements as to the actual shooting of Mary Jane Stout, which the defendant believes the evidence will show occurred at the hands of Daniel Wesley.

The district court rejected Stumpf's argument that his position that he was not the shooter rendered his guilty plea involuntary, relying on *Garcia v. Johnson*, 991 F.2d 324, 327 (6th Cir. 1993), as authority for the proposition that a "temporary qualification of position by the defendant is not sufficient to rebut the presumption of correctness of state court proceedings, and to support a finding that [the defendant] did not understand the nature of his plea." *Stumpf v. Anderson*, 2001 WL 242585 (S.D. Ohio 2001) (quoting *Garcia*, 991 F.2d at 327). We conclude that the district court's reliance was misplaced, however, because Stumpf's qualification was more than temporary, and it was never addressed by the trial court.

By contrast, in *Garcia*, the defendant first claimed that he had not intended to kill his victim. *Garcia*, 991 F.2d at 327. After this statement, the judge conducted "a substantial discussion" with the defendant regarding the facts of the case, and Garcia then admitted that he had intended to kill his

victim. *Id.* Here, the trial judge, before accepting Stumpf's plea, had not informed the defendant that specific intent was an element of the crime to which he was pleading, nor had he inquired whether Stumpf had actually shot the victim or, if not, had specifically intended that she be killed. In the absence of some inquiry, Stumpf's express reservations of his ability to put on evidence of his version of the crime, along with his attorneys' arguments that he did not intend, and was not even present for, the killing of Mrs. Stout, should have put the trial court on notice that Stumpf was not aware of the true import of his plea.

The district court did not focus on the question of intent. Rather, it found that Stumpf's position that he was not the shooter was consistent with the *specification* to which he pleaded guilty. However, in making this finding, the district court failed to recognize that Stumpf's position is inconsistent with the *charge* to which he also pleaded guilty. It is this inconsistency that gives rise to his claim that his plea was not validly entered.

Generally, a reviewing court presumes that defense counsel has explained the elements of the crime to a defendant pleading guilty, even where the record does not reflect any statement by counsel to that effect. *Berry v. Mintzes*, 726 F.2d 1142, 1147 (6th Cir. 1984) ("it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice"); *but cf. Henderson v. Morgan*, 426 U.S. 637, 642-48 (1976) (finding that, where the defendant's attorneys had argued to the court that their client had not intended to harm the victim, there could be no presumption that counsel had explained to their client that intent was an element of the crime). In this case, defense counsel did state to the court that they had informed Stumpf of the elements of the crime. In a typical case, such an assurance would prevent a reviewing court from finding that a plea was involuntary. In this case, however, the record clearly establishes that Stumpf sought to preserve his right to argue that he was not the shooter and

thus counterbalances the assurances given by defense counsel that they had explained the elements to Stumpf.

We recognize, of course, that Stumpf need not have been the "principal offender" – the actual shooter – in order to have specifically intended the death of Mary Jane Stout. Nevertheless, it is clear from the record of the factual basis hearing that the state's theory of guilt relied completely on Stumpf being the principal offender. The prosecution presented no evidence that Stumpf intended Mrs. Stout's death, other than arguing that he was the actual shooter. In the closing arguments at the evidentiary hearing, defense counsel, contending that the prosecution had not met its burden with regard to the basis for seeking the death penalty, effectively challenged the prosecution's proof as to specific intent to kill. The prosecutor responded that "[a]s to a purpose to kill, whoever shot Mrs. Stout didn't intend to do her any favors when he shot her four times. It seems to me that shooting a person four times shows what your intent was."

Indeed, the three-judge panel, which presumably knew of the intent element, found, beyond a reasonable doubt, that Stumpf was "the principal offender" in the aggravated murder and made no other finding as to specific intent. Their conclusion in this regard indicates that the panel found that Stumpf's shooting of Mrs. Stout provided the requisite specific intent, as there was no other evidence in the record to satisfy this element. Given this finding, it is unlikely that Stumpf can be said to have knowingly conceded specific intent to kill by pleading guilty, when he continued to maintain throughout the proceedings that he had not been the one who actually shot the victim.

We conclude that the record of Stumpf's plea hearing and the subsequent evidentiary hearing, taken together, demonstrate that the plea he entered was constitutionally invalid. *Boykin* holds that, "because a guilty plea is an admission of all the elements of a formal criminal charge, it

cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *Boykin*, 395 U.S. 238, 243 n.5 (1969). This understanding must include "real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process." *Henderson v. Morgan*, 426 U.S. 637, 644 (1976) (quoting *Smith v. O'Grady*, 312 U.S. 329, 344 (1941) (finding that, because the defendant did not know intent was an element of the crime to which he pleaded guilty, his plea could not be voluntary).[5] We have held that "a guilty plea is not deemed voluntary where the person entering it does so without understanding of the consequences of his plea." *United States v. Stubbs*, 279 F.3d 402, 411, 412 (6th Cir. 2002) (quotation omitted) (finding, in a split decision in a case involving a mandatory minimum sentence, that if the "essential elements of the crime with which the defendant was charged were not understood by the defendant, his counsel, or the district court, then the defendant's guilty plea would be constitutionally invalid").

As discussed above, when the state court record of a defendant's plea does not demonstrate that the plea is constitutionally adequate, the state bears the burden of showing the plea was voluntary, knowing and intelligent. Here, the state has presented no extrinsic evidence to counter the record of the proceedings discussed above. Instead, the respondent has explicitly relied on that record alone to argue that the plea was voluntary, knowing, and intelligent. Given the paucity – indeed, the lack -- of the evidence to refute what is clear on the record, we must conclude that the state has therefore not met its burden of showing that the plea may stand.

[5] Indeed, in *Henderson*, the defendant had heard the indictment, which charged that he had "willfully" stabbed the victim, read in open court. *Henderson*, 426 U.S. 637, 642. The Supreme Court found that this was not sufficient to put him on notice that intent was a required element of the crime to which he was pleading guilty. *Id.* at 645-46.

Furthermore, the totality of the circumstances surrounding the plea provide additional evidence that the plea was not voluntary, knowing, and intelligent. For example, Stumpf argues that the fact that he remained eligible for the death penalty and, therefore, pleaded guilty under an agreement that provided absolutely no benefit in the form of a reduction in possible sentence, is an additional indication that his plea was not knowing and intelligent.[6] This argument standing alone would be not carry much weight, given the well-recognized principle that a guilty plea cannot be rendered involuntary merely because, in hindsight, it turned out not to be the best decision. *See McMann v. Richardson*, 397 U.S. 759, 769-71 (1970). However, Stumpf's decision to plead guilty – by agreement – to a crime with a capital specification, especially in the absence of any identifiable reason to take such a course of action, creates an additional inference that his plea was invalid. In combination with his position that he was not the shooter, which reveals his ignorance of specific intent as an element of the crime, the record indicates that Stumpf's plea was involuntary "because he ha[d] such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt." *Ivy v. Caspari*, 173 F.3d 1136, 1141-42 (8th Cir. 1999)(guilty plea involuntary where defendant was not informed that intent was a necessary element of the underlying felony).

The question of counsel's effectiveness in representing Stumpf is not before us as an independent ground for relief. It is, however, raised in the context of challenge to the validity of his guilty plea. The record shows clearly that

[6] Stumpf also claims that his plea was invalid because he was not aware that he remained eligible for the death penalty. We discount this as a possible basis for relief, however, because the record of the plea hearing indicates that the judge, while listing the possible sentences Stumpf could receive for aggravated murder, did inform Stumpf at the time of his plea that "the death penalty by electrocution could be imposed against you." The judge then asked whether Stumpf understood, and Stumpf answered, "Yes, sir."

Stumpf has always denied being the shooter. It is also clear that defense counsel's strategy, throughout both the evidentiary hearing and the mitigation hearing, was to argue that after Stumpf shot Norman Stout he panicked and fled, that Stumpf was not even present in the home when Mary Jane Stout was shot, and that Wesley was, in fact, the one who shot Mrs. Stout. One possible, if unlikely, explanation for counsel's strategy is that they themselves were unaware that specific intent was an element of the crime. But, failure to research the most basic details of the statute under which their client was charged would be outside the "range of competence" to which the defendant is entitled. *See Henderson v. Morgan*, 426 U.S. 637, 647 (1976). Perhaps more disturbing is the possibility that counsel, realizing that intent was an element of the offense, nonetheless chose to allow their client to plead guilty and then – and only then – to contest the existence of that element. But this, too, would manifestly constitute ineffective assistance, since a plea is not merely a confession but serves as a conviction, with only the resulting sentence left to be decided. *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). It is true that Ohio requires a factual basis hearing in cases of aggravated murder, but it would nonetheless be reckless and plainly incompetent for an attorney to rely on a factual basis hearing to refute an element of a crime to which his client has already pleaded guilty. Finally, whether Stumpf's lawyers were aware of the intent element or not, their behavior compels the conclusion that Stumpf himself was not aware of the intent element. Stumpf's observation of his attorneys' attempt to contest the state's version of events, and his own position throughout the plea colloquy that he intended to challenge the state's facts- a position evidently sanctioned by his attorneys, reaffirms the conclusion that Stumpf was not aware that by pleading guilty to aggravated murder he was admitting to specific intent to kill Mary Jane Stout.

There are other indications in the record, as well, pointing to the existence of at least a reasonable probability that Stumpf would not have pleaded guilty had he known that

such a plea would have amounted to admitting that he specifically intended the death of Mary Jane Stout. A mitigation investigator later reported, in an affidavit, that "John did not want to plead guilty." Moreover, affidavits from Stumpf's family affirm the impression that his attorneys were less than candid in explaining to them the motive behind the plea. for example, Stumpf's mother and sister said that they were told by Stumpf's attorney that he would not receive the death penalty because of his plea.

We conclude from the record before us, as it relates to the murder of Mary Jane Stout, that there exists a reasonable probability that, had the petitioner been fully informed of the elements of the offense to which he was pleading and consequences of that plea, he would not have pleaded guilty to her aggravated murder.

**B. The Due Process Violation**

At the time of Stumpf's post-plea evidentiary hearing and his mitigation – or sentencing – hearing, his accomplice, Wesley, was still in Texas, fighting extradition. During both Stumpf's plea hearing, held pursuant to Ohio Rev. Code § 2945.06, and his sentencing hearing, the prosecutor argued, and the three-judge panel ultimately found, that Stumpf was the principal offender, responsible for actually shooting Mary Jane Stout. After Stumpf's sentencing in the fall of 1984, the state tried Clyde Wesley before a jury in the spring of 1985. Wesley was also charged with aggravated murder with capital specifications, and during his trial, the state argued that Wesley, not Stumpf, was the shooter. To support this argument, the state presented testimony from Eastman, Wesley's cellmate, about statements Wesley had made to Eastman concerning details about the murder. Wesley took the stand and denied that he was the shooter, but the jury convicted him of the aggravated murder of Mrs. Stout. At the sentencing phase of Wesley's trial, the same jury then recommended a sentence of 20 years to life, rather than the death penalty.

Stumpf argues that the prosecutor's use of two conflicting theories concerning the identity of the shooter to convict both him and Wesley constitutes a due process violation.

The Constitution's Due Process clause guarantees every defendant the right to a fair trial. *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 24-5 (1981); *Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965). The Supreme Court has also emphasized that "because the prosecutor is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. . ., it is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate method to bring about one." *Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds*, *Stirone v. United States*, 361 U.S. 212 (1960).

Drawing on the principle that the Constitution's "overriding concern [is] with the justice of the finding of guilt," *United States v. Agurs*, 427 U.S. 97, 112 (1976), several of our sister circuits have found, or implied, that the use of inconsistent, irreconcilable theories to secure convictions against more than one defendant in prosecutions for the same crime violates the due process clause. *See, e.g.*, *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000); *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997) (en banc); *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) (en banc) (Clark, J., specially concurring); *cf. Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995) (involving a situation where both defendants had shot at the victim and it was unclear whose bullet had actually hit and killed the victim; the court found that the two theories advanced by the prosecution were not inconsistent because both defendants could have been convicted under the law of parties). On this issue of first impression in this court, we now join our sister circuits in finding that the use of inconsistent, irreconcilable theories to convict two defendants for the same crime is a due process violation.

In *Smith v. Groose*, the Eighth Circuit considered a case in which a prosecutor had used two different, conflicting statements by a co-defendant at successive trials to convict the petitioner at the first trial and a second individual at a second trial. *Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir. 2000). That case involved a group of four young men who were looking for homes to burglarize one evening. In the course of their search, they saw another group of burglars breaking into a home. They realized they knew these men and decided to help them break into the house. The residents were murdered in the course of the burglary. The primary issue at trial was whether the murders took place before or after the four young men began participating in the offense. One of the four men first told the police that the other group had committed the murders without the participation of the group of four. Two days later, he told police that he had seen one of the four men from his group stabbing the victims with a pocketknife; he later recanted this story. The prosecutor then used both statements to obtain convictions against men in each of the two groups. *Id*. at 1047-49.

Examining the record before it, the Eighth Circuit held that "[t]he use of inherently factually contradictory theories violates the principles of due process." *Id*. at 1052. The court found that in order to amount to a due process violation, an inconsistency in the prosecutor's theories "must exist at the core of the prosecutor's case against defendants for the same crime." *Id*. This constitutes a due process violation because it renders convictions unreliable, given that "[the s]tate's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth." *Id*. at 1051.

In finding a due process violation under these circumstances, the Eighth Circuit in *Smith v. Groose* was careful to distinguish the facts in its case from those in the Fifth Circuit's opinion in *Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995), where the court did not reach the due process question in a case in which the prosecutor argued in two

separate cases that different defendants had each shot the one bullet that killed the victim. *Id*. at 1268. The distinction in the *Nichols* case was that both perpetrators had fired shots at the victim, and both could have been convicted under a felony murder theory. Therefore, the prosecutor's arguments were not factually inconsistent, because both defendants could have been convicted even if the prosecutor had used the identical argument in both cases. *Groose*, 205 F.3d at 1051.

Finally, the Ninth Circuit considered a similar situation in *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997) (en banc), *vacated on other grounds*, 523 U.S. 538 (1998). In that case, the prosecutor argued at one trial that, based on jailhouse informant testimony, one defendant had committed a rape and murder. At a second trial, the prosecutor used different jailhouse informants to argue that the second defendant had the motive and disposition to commit the crimes. A plurality of the en banc Ninth Circuit,[7] specifically excluding situations where new evidence comes to light, found that a prosecutor cannot use inconsistent theories of the same crime in order to secure multiple convictions. *Id*. at 1058. The court echoed Judge Clark's concurrence in an

---

[7]The majority opinion rested on an ineffective assistance of counsel claim. *See Thompson v. Calderon*, 120 F.3d 1045, 1051-56 (9th Cir. 1997)(en banc). However, despite the fact that a majority of judges did not join in the portion of the opinion finding a due process violation, several of the concurring and dissenting judges indicated that they would find a due process violation for the use of wholly inconsistent theories to convict separate defendants. *See, e.g., Thompson*, 120 F.3d at 1063-64 (Tashima, J., concurring, joined by Thomas, J.)(agreeing with the premise that "due process is violated when a prosecutor pursues wholly inconsistent theories of a case at separate trials" but arguing that, in order to find prejudice, the court must decide which of the two theories is true)(quotation omitted); *Thompson*, 120 F.3d at 1066-73 (Kozinski, J., dissenting, joined by Nelson, J.)("In the case of mutually inconsistent verdict, which I am not sure is the case here, I believe that the state is required to take the necessary steps to set aside or modify at least one of the verdicts." *Id*. at 1071.)

Eleventh Circuit case which, although it granted habeas relief on alternate grounds, also involved inconsistent theories:

> The prosecutor's theories of the same crime in the two different trials negate one another. They are totally inconsistent. This flip flopping of theories of the offense was inherently unfair. Under the peculiar facts of this case the actions by the prosecutor violate the fundamental fairness essential to the very concept of justice. . . The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for the truth.

*Thompson*, 120 F.3d at 1059 (quoting *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (en banc) (Clark, J., concurring)).

In this case, the state clearly used inconsistent, irreconcilable theories at Stumpf's hearings and Wesley's trial At each proceeding, the prosecutor argued that the defendant had been the one to pull the trigger, resulting in the fatal shots to Mary Jane Stout. At Wesley's trial, the prosecutor relied on Eastman's testimony and on the gun-switching scenario argued by Stumpf, to secure Wesley's conviction. The prosecutor asserted:

> Believing he had killed Mr. Stout, [Stumpf] pitched the gun aside and left the immediate area back the hallway down the steps to the basement. At that point [Wesley,] whose own gun was jammed, picked that chrome colored Raven up and as Mrs. Stout sat helplessly on her bed, shot her four times in order to leave no witnesses to the crime.

These statements are irreconcilably inconsistent with those made by the very same prosecutor at Stumpf's plea hearing, when he told the trial court:

Believing that the had killed Mr. Stout, Stumpf [then] turned the same chrome colored Raven automatic pistol upon Mary Jane Stout as she sat on the bed and shot her four times. Three times in the left side of the head and neck and one time in the writs; obviously in order not to leave anyone available to identify him.

The state claims that, because Eastman's testimony was not available at the time of Stumpf's guilty plea, Stumpf is really asserting Wesley's due process claim in the guise of his own. The state also argues that "it was of no import to the charge of capital murder against Stumpf which of the two [defendants] killed the witness [Mrs. Stout]" since the capital specification was that Mrs. Stout was killed because she was a witness to the crime, and not that the defendant had been the shooter. Finally, the state asserts that inconsistent, irreconcilable theories were not used in these two cases, because the prosecution did not rely on Eastman's testimony at Wesley's trial. None of these arguments is persuasive.

First, Stumpf clearly has a due process claim even though Eastman's testimony was not available at the time of his trial. It is true that this is not a case where the prosecutor selectively presented evidence in Stumpf's case to support the theory of the murder he was arguing in that case. However, the due process challenge to the use of inconsistent theories is based on the notion of fundamental fairness. Because inconsistent theories render convictions unreliable, they constitute a violation of the due process rights of any defendant in whose trial they are used. In *Groose*, the petitioner was in fact the defendant at the first trial, and the second, inconsistent theory did not come to light until four years after his conviction, at the second trial. *Groose*, 205 F.3d at 1048. Nevertheless, the Eighth Circuit found that his due process rights had been violated. Logically, "both [defendants' due process rights] were prejudiced by the prosecutor's actions or neither's were." *Drake*, 762 F.2d at 1479 (Clark, J., concurring). Furthermore, it is disingenuous of the state to argue that there is no violation of Stumpf's

rights because the prosecutor had no knowledge of Eastman's testimony at the time of Stumpf's plea. The state learned of Eastman's testimony soon after Stumpf's plea and sentencing and yet continued to maintain that the convictions of both Stumpf and Wesley, each of which was obtained by arguing that a different individual was the shooter, were sound and reliable.[8] Indeed, as discussed below, the state maintained that Eastman's testimony was unreliable during a hearing on Stumpf's motion to vacate his plea and/or his sentence. To this day, there has been no suggestion of corrective action by the state.

The state's second argument, with which the district court agreed, is that the identity of the shooter was not the critical issue in either trial and that therefore the use of different theories did not violate Stumpf's due process rights. By pleading guilty to capital murder, the state's argument goes, Stumpf admitted concerted action with Wesley in causing the death of Mary Jane Stout for the purposes of avoiding detection. All that was left for the prosecution then to prove, under this theory, was that Mrs. Stout was killed so that the defendant could escape detection for other crimes. But this argument ignores the fact that, as the aggravated murder statute existed in 1984, specific intent was a necessary element of the crime. Ohio Rev. Code § 2903.01(B); *see also supra*, pp.15-16. Because Stumpf never confessed to specific intent to kill Mrs. Stout, the prosecution bore the burden of proving beyond a reasonable doubt that Stumpf was guilty of the charge.

Finally, the state argues that irreconcilable theories were not used because Eastman's testimony was completely

---

[8]In fact, Wesley's counsel wanted to inform the jury that the prosecutor had previously argued that Stumpf, and not Wesley, was the shooter. The prosecutor argued that Stumpf had never admitted to firing the shots, and that his own argument was irrelevant. The trial court did not allow Wesley's counsel to discuss Stumpf's proceedings in front of the jury.

unreliable. State's counsel even asserted at oral argument that the state did not rely on Eastman's testimony in order to prosecute Wesley. This argument is just short of astounding, given the fact that in seeking to convict Wesley of aggravated murder, the prosecution offered no proof of the element of specific intent other than the theory that Wesley was the actual shooter. That the state relied on Eastman's testimony is evident from the fact that it presented his testimony to the jury, and from the fact that it prevented Wesley's counsel from presenting evidence of Stumpf's guilty plea. Had the state presented a theory of the crime consistent with the theory it asserted at Stumpf's evidentiary hearing, it would have had no need to keep that information from Wesley's jury.

The district court ultimately accepted the state's argument that the core issue at Stumpf's evidentiary hearing was not the identity of the shooter. However, in reaching this conclusion, the court started with what we believe to be a faulty assumption, *i.e.*, that "the state was not required to prove that petitioner was the actual shooter." The district court, in concluding that the specification to which Stumpf pleaded guilty, Ohio Rev. Code § 2929.04(A)(3), did not require that Stumpf be proven to be the "principal offender," overlooked, once again, the fact that the aggravated murder statute itself requires specific intent. *See* discussion supra pp. 15-16. The state was not required to prove that the petitioner was the actual shooter, but it was required to prove specific intent.

Even proceeding from the district court's false assumption, however, we cannot agree with the court's ultimate conclusion. The district court found that, although the state was not required to prove that Stumpf was the actual shooter, "the fact remains that the state did argue that petitioner was [the] actual shooter and the trial court did find that petitioner was the actual shooter." The district court went on to recognize that the trial court cited this very finding as "a reason, and a very substantial reason" that petitioner received the death penalty. The district court found, however, that

habeas relief was not warranted, because the Supreme Court of Ohio's independent reweighing of the aggravating and mitigating circumstances cured any misplaced reliance on Stumpf having been the actual shooter. Apparently engaging in such a reweighing process, the Ohio Supreme Court concluded that Eastman's testimony was not sufficient to tip the balance of aggravating and mitigating factors.

We cannot agree with this reasoning, because we do not believe that a reweighing of the factors used to support imposition of the death penalty cures the due process violation at issue. The Ohio Supreme Court, it is true, found that "the testimony of a cellmate during Clyde Wesley's trial is of minimal credibility, especially in light of appellant's guilty plea and the substantial evidence to the contrary adduced during appellant's sentencing hearing." *State v. Stumpf*, 32 Ohio St. 3d at 106. But, putting aside for the moment the question of whether Eastman's testimony need be credible for a due process violation to be established by the state prosecution's presentation of and evident reliance on it, there is no explicit state court determination regarding Eastman's credibility to which this court must give deference. Although there is a presumption that a state court's factual findings are correct, this presumption applies only to basic facts and to those facts implicitly established through the trial court's unique ability to judge the witnesses' credibility and demeanor. *See McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). No court at any level considering Stumpf's claims actually observed Eastman's testimony.[9] The first court explicitly to examine the transcripts of that testimony, the two-judge trial panel, failed to make any factual findings, instead denying Stumpf's motion summarily. The Supreme

---

[9]Indeed, only two fact-finders actually observed Eastman's testimony. The jury at Wesley's trial obviously credited Eastman enough to find Wesley guilty. The trial judge, in pre-trial proceedings, made at least one credibility determination when he found that Eastman was not a government agent within the meaning of *Miranda v. Arizona*, 384 U.S. 436 (1966). *See State v. Wesley*, 1986 Ohio App. LEXIS 8651 (1986).

Court of Ohio recognized as much when it found that the trial court had "apparently" determined that Eastman's testimony did not change the balancing of mitigating and aggravating factors. The Supreme Court of Ohio also presumably examined the transcripts, concluding that the testimony was of "minimal credibility." Neither the presumed factual finding by the trial court, nor the more explicit one made by the Supreme Court of Ohio is due the type of complete deference contemplated by the state, because neither of these courts had any better opportunity to judge Eastman's credibility than we do.

Finally, the state presses an argument that Eastman's testimony was not credible because it relied on "the same type of implausible gun switching and gun juggling that Stumpf told."[10] This, of course, is beside the point. The pertinent fact for Stumpf's due process claim is not whether Eastman's gun-switching story is plausible,[11] but whether the prosecution relied on that story to secure Wesley's conviction. The prosecution found Eastman's testimony credible enough to present the "implausible gun switching" theory to Wesley's jury and obtain his conviction on that theory.

In holding that a constitutional violation occurred in this case, we recognize that at least one circuit has suggested that a due process violation for the use of conflicting theories may be obviated when the second of two inconsistent theories results from the discovery of new evidence. *See Thompson v. Calderon*, 120 F.3d 1045, 1058 ("when no new significant

---

[10]Eastman testified at Wesley's trial that Wesley told him that after Stumpf had shot Mr. Stout, Stumpf panicked and dropped the .25 caliber Raven. Wesley then picked up the Raven and shot Mrs. Stout a few times. When Mrs. Stout moaned, Wesley shot her again to make sure she was dead.

[11]One could argue that this story is more likely to be plausible because it is so similar to Stumpf's account of the crime, which he recounted many months before Eastman testified.

evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime"). We have no quarrel with this proposition, to the extent that it is meant to acknowledge a state's need to continue to investigate crimes and to present all available evidence in court. However, in this case, although Eastman's testimony did not come to light until after Stumpf had been convicted and sentenced to death, the state had many opportunities to correct its use of conflicting theories. Stumpf, upon learning of the state's reliance on the theory that Wesley was actually the shooter, timely filed a motion to vacate his guilty plea and/or his sentence. The two judges hearing this motion expressed some concern over whether there was evidence that Stumpf was not in fact the shooter, but the state did not take that opportunity to advocate that all the available evidence be presented to the sentencing panel.

A due process claim is a mixed question of law and fact and is therefore subject to *de novo* review. *Williams v. Coyle*, 260 F.3d 684, 706-07 (6th Cir. 2000). Here, the proper standard of review is whether there is a reasonable probability that the prosecutor's use of inconsistent, irreconcilable theories rendered the conviction unreliable. *See, e.g., id.*, 260 F.3d at 706-07; *Brady v. Maryland*, 373 U.S. 83 (1963); *Strickland v. Washington*, 466 U.S. 668, 694(1984). A "reasonable probability" is a probability sufficient to undermine the outcome and is less than a preponderance of the evidence. *Strickland* at 694; *Lyons v. Jackson*, 299 F.3d 588, 599 (6th Cir. 2002).

Measured against this standard, the state's due process violation mandates that both Stumpf's plea and his sentence be set aside. First, there is a reasonable probability that, had the prosecution not pursued conflicting theories concerning who was the actual shooter, Stumpf either would not have pleaded guilty or the three-judge panel would not have found a factual basis for the specific intent element of aggravated murder. Second, and perhaps more likely, there is a

reasonable probability that, had the prosecution not pursued inconsistent theories, Stumpf would not have been sentenced to death.

As discussed at length above, it was necessary for the three-judge panel to find that Stumpf specifically intended the death of Mary Jane Stout in order for it to accept his plea to aggravated murder. Ohio Rev. Code § 2903.01(D) ("[n]o person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another"). The prosecution offered virtually no evidence regarding intent other than its contention that Stumpf shot Mrs. Stout. Had the prosecution's alternate theory been heard by the three-judge panel, there is a reasonable probability that it would have found Stumpf guilty of something less than aggravated murder.

Moreover, there is more than a reasonable probability that the three-judge panel would not have sentenced Stumpf to death had the prosecution not employed inconsistent and irreconcilable theories. In explaining its reasoning for finding that the aggravating factors in Stumpf's case outweighed the mitigating factors (and therefore that Stumpf deserved the death penalty), the court's first pronouncement was that it had "f[oun]d beyond a reasonable doubt that the Defendant was the principal offender in count one of the indictment," *i.e.*, the aggravated murder charge. In turn, this finding prevented the panel from concluding that Stumpf was *not* the principal offender, which would have been "a powerful mitigating factor." *State v. Green*, 90 Ohio St. 3d 352, 363 (2000)(noting that "[v]ery few death sentences have been approved against persons who were not the principal offender"). In fact, during the hearing on Stumpf's motion to withdraw his guilty plea, one of the original panel members, Judge Bettis, stated:

[I]f we had not been satisfied that Stumpf was, in fact, the trigger man, the principal offender. . . that may very well have had an effect upon this Court's determination

of whether the death penalty should follow. I'm not saying it would, but it's possible.

It is true that Judge Bettis made this comment during a hearing in which the panel had before it both a transcript of Eastman's testimony and evidence of the prosecution's reliance on that theory of the crime. However, the fact that the panel did not grant Stumpf's motion to withdraw his guilty plea does not dictate the conclusion that they did not find Eastman's testimony persuasive. First, in denying the motion summarily, the panel stated, "The Court took the matter under advisement and after having considered the same, does overrule the Motion to Withdraw Former Plea and the Alternative Motion to Set Aside the Sentence Imposed." Because the court gave no basis for its ruling, the denial of relief could have been made on any number of grounds; it would be impossible to divine its reasoning. Hence, the panel's rejection of Stumpf's motion does not negate the conclusion that, had the prosecution's alternate theory been before the panel at a sentencing proceeding, there is a reasonable probability that the panel would not have sentenced him to death. Second, only two of the three judges on the original panel were still alive when Stumpf brought his motion. Stumpf's contention that his motion should have been heard by three judges was rejected by the Ohio Supreme Court:

R.C. 2945.06 expressly provides that "[t]he judges or a majority of them may decide all questions of fact and law arising upon the trial. . . ." Unanimity is mandated only when the panel finds a defendant guilty or not guilty. Whether appellant was entitled to withdraw his guilty plea or to a new sentencing hearing were questions of law, properly determined by a majority of the panel.

*State v. Stumpf*, 32 Ohio St. 3d 95, 105 (1987).

Under Ohio Rev. Code § 2945.06, then, only one judge's opinion was required to deny Stumpf's motion. However,

under the same provision, unanimity was required as to questions of guilt and penalty. Because the third judge on Stumpf's panel died before the prosecution's alternate theory and Eastman's testimony came to light, the trial court's denial of Stumpf's motion can prove nothing as to whether that third judge, at the factual basis or mitigation hearings, would have been persuaded by Eastman's testimony, and the state's reliance on it, that Stumpf should either not have been found guilty of aggravated murder, or should not have received the death penalty.

Finally, as petitioner points out, Ohio courts have held that reweighing of aggravating and mitigating circumstances by a higher court is not a cure for errors in the sentencing process, where the result of the weighing process, had the correct factors been present, is unknown. *State v. Davis*, 28 Ohio St. 3d 361, 372 (1988) ("We cannot accept independent review as a cure in this particular action because we cannot know if the result of the weighing process by the three-judge panel would have been different had the impermissible aggravating circumstance not been present.").

## IV. *CONCLUSION*

On the basis of the two claims addressed in this opinion, that Stumpf's guilty plea was not voluntary, knowing and intelligent and that his due process rights were violated by the prosecution's use of inconsistent, irreconcilable theories to convict both him and his accomplice, we REVERSE the district court's decision and REMAND this case to the district court with instructions to issue the writ of habeas corpus in the petitioner's favor, unless the state elects to retry him within 90 days of the date of entry of the conditional writ. Because we are granting Stumpf relief on both his involuntary plea and due process claims, we need not reach his remaining arguments.

---

## DISSENT

---

BOGGS, Chief Judge, dissenting. The court has reversed the district court's denial of a writ of habeas corpus on two grounds: that Stumpf's guilty plea was involuntary and unknowing, and that his due process rights in his own trial and sentencing were violated by the state's *later* use of evidence against another person. I disagree with both of these conclusions, and therefore respectfully dissent from the granting of the writ of habeas corpus.

### I

I begin with the second of the court's two grounds, as I believe that is the more profoundly mistaken. The majority cites three cases from other circuits to buttress its theory that Ohio's prosecution of Wesley, which took place in April 1985, some seven months after Stumpf pleaded guilty and was sentenced to death, somehow violates Stumpf's due process rights. None of the three are germane to this case.

In *Thompson v. Calderon*, a celebrated California death penalty case, the court vacated a death sentence because the prosecutor presented two mutually incompatible theories for the rape-murder during contemporaneous trials of two defendants, Thompson and Leitch. *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997) (en banc) (plurality), *vacated on other grounds*, 523 U.S. 538 (1998). During the pre-trial proceedings for both men, and in Leitch's trial, the prosecutor's theory was that Leitch killed the victim, his girlfriend, because he wanted to get back together with his ex-wife; Thompson assisted him in the crime. *Id*. at 1055. In Thompson's trial, however, the prosecutor argued that Thompson had raped the victim and then killed her to cover up his act. He presented different jail house informants at each trial to bolster each contradictory theory. *Id*. at 1056.

The Ninth Circuit held that this shift in arguments violated a prosecutor's duty to discover the truth and that he was improperly trying to secure convictions for their own sake. *Thompson,* 120 F.3d at 1058-59; *see, e.g., Berger v. United States*, 295 U.S. 78, 88 (1935) (stating that the government's fundamental interest in a criminal prosecution is "not that it shall win a case, but that justice shall be done"). It also found that Thompson, who was tried first, was prejudiced due that the fact that "[o]nly in Thompson's trial did the prosecutor change the theory and the arguments [from those presented in the pre-trial hearing], and offer facts that directly conflicted with the underlying premise of the charges he brought." *Thompson*, 120 F.3d at 1059.

Distinguishing *Thompson* from the case before us is not difficult, however. First of all, the prosecutor in *Thompson* pursued the two mutually incompatible theories of the murder at contemporaneous trials after joint pre-trial proceedings, and deliberately chose witnesses who would tell the conflicting story that he needed to convict each defendant. Knowingly putting on false evidence is prosecutorial misconduct that violates the Due Process Clause. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Nothing in this case indicates that the prosecutors deliberately presented false evidence: Stumpf pleaded guilty to aggravated murder with the specification of killing a witness and attempted aggravated murder with a firearm. The State had every reason to believe his over-all admission of responsibility. It was under no obligation, however, to accept at face value his assertion that he did not actually pull the trigger, especially in light of contradictory forensic evidence, such as the fact that a .25-caliber weapon killed Mrs. Stout, the same caliber as Stumpf's gun.

Nor did the prosecutor in *Thompson* collect new evidence between trials; he simply manipulated the facts that he had. In contrast, Wesley's trial took place seven months after Stumpf pleaded guilty, during which time informant Eastman told prosecutors that Wesley confessed that he murdered Mrs. Stout. However, Wesley denied having confessed to

Eastman, and the forensic evidence suggested that Eastman's statement was not airtight. A cursory comparison of the facts to those in *Thompson* therefore reveals that the California case has little application to our case.[1]

In *Drake v. Kemp*, an Eleventh Circuit case, the majority remanded for a new trial because the burden of proof was improperly shifted to the defendant and the prosecutor violated the defendant's rights during his closing arguments in the sentencing phase. *Drake v. Kemp,* 762 F.2d 1449 (11th Cir. 1985) (en banc). A single concurring judge argued that Drake's Fourteenth Amendment rights had been violated. The prosecutor, in trials that were a year apart, argued in one instance that a co-defendant must have committed the murder alone and, after having secured a conviction, argued that same person was not strong enough to commit the crime, and therefore Drake must have helped. The concurring judge concluded that it "seems inescapable that the prosecutor obtained Henry Drake's conviction through the use of testimony he did not believe; bringing this case under the logical if not actual factual framework of . . . *Napue*." *Drake,* 762 F.2d at 1479 (Clark, J. specially concurring). *Drake* therefore does not further Stumpf's case either: a concurring opinion that turns on the prosecutor's inferred knowledge that he was presenting false evidence does not comport with the facts in this case.

The last case cited by the majority, *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000), is equally unconvincing. That case involved two groups of robbers, the first of which, when preparing to burglarize a house, discovered the second already in the process of stealing the homeowner's possessions. The two groups joined forces, and at some point during the crime the homeowners were murdered. *Id.* at

---

[1] It is worth noting that constitutional claim made in *Thompson* ultimately did not prevent the defendant's execution on July 14, 1998. *Calderon v. Thompson*, 523 U.S. 538, 566 (1998) (reinstating the mandate denying habeas relief).

1047. The leader of the first group, Anthony Lytle, provided varying accounts of what happened, alternately claiming that the head of the second group, Michael Cunningham, killed the couple and that one of his (Lytle's) cohorts, James Bowman, was the murderer. *Id.* at 1047-48. The state convicted Jon Keith Smith, another member of Lytle's group, for felony-murder based on his association with purported fellow gang member Bowman, who was argued to be the actual killer. Four months later, the state then successfully prosecuted Cunningham for the same murders, based on Lytle's other story that Cunningham had already killed the couple when Lytle and his friends entered the house. *Id.* at 1048.

The Eighth Circuit ultimately granted Smith a writ of habeas corpus because the state's prosecution of Cunningham violated Smith's due process rights. *Ibid.* Again, the crux of the case was the deliberate presentation of false evidence: "In short, what the State claimed to be true in Smith's case it rejected in Cunningham's case, and vice versa." *Id.* at 1050. Only a showing of this kind of prosecutorial misconduct could support a claim, dubious as it might be, that Stumpf's constitutional rights were retroactively violated.

Although this court mentions the prosecution's knowledge of Eastman's subsequent statement concerning Wesley's alleged confession to being Mrs. Stout's killer, the court's decision does not rest on this knowledge. It is undisputed that the prosecution did not know of Eastman's statement at the time of Stumpf's conviction and sentencing. Nothing indicates that the prosecution cherry-picked facts in order to confirm Stumpf's guilty plea in the evidentiary hearing. The majority does not argue that the prosecution was under any obligation to confess error in Stumpf's post-conviction proceedings or appeals, nor even to bring Eastman's statement to Stumpf's attention. There is simply no prosecutorial misconduct in this case that could retroactively implicate Stumpf's due process rights.

*Groose* does not "hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather [it] hold[s] only that the use of inherently factually contradictory theories violates principles of due process." *Id.* at 1052. The majority remarkably expands this holding to conclude that *evidence* in a second case that contradicts a *guilty plea* in an earlier case can implicate due process rights. Stumpf pled guilty after a colloquy in which he indicated that he understood that he was waiving certain constitutional rights. A defendant's guilty plea is an "admission that he committed the crime charged against him." *North Carolina v. Alford*, 400 U.S. 25, 32 (1970). Nothing in the record suggests that the prosecutor was remiss in relying on Stumpf's acknowledgment of guilt. *See Dickerson v. United States*, 530 U.S. 428, 450 (2000) (Scalia, J., dissenting) (observing that if a defendant voluntarily acknowledges wrong-doing, the "Constitution is not . . . offended by a criminal's commendable qualm of conscience or fortunate fit of stupidity).[2] Therefore, I do not see any grounds on which to base an allegation that the prosecution skewed the same set of facts in two different trials in order achieve two mutually incompatible guilty verdicts. This case has little or no similarity with the facts of *Thompson, Drake,* and *Groose*.

Far more instructive is the Ninth Circuit's quite recent decision in *Shaw v. Terhune*, 353 F.3d 697 (9th Cir. 2003). The court held that imposing sentence enhancements on two defendants for personal use of a firearm during an attempted robbery and assault on a restaurant manager was not a

---

[2] Even assuming, *arguendo*, that the majority is correct that Stumpf pled guilty based on substandard legal advice, it does not follow that accepting the acknowledgment of guilt amounts to prosecutorial misconduct, the prerequisite for finding a violation of Stumpf's constitutional rights. The majority argues that the plea was not voluntary, a conclusion I address *infra*, but the validity of the plea is an entirely different matter. However flawed a defendant's guilty plea might be, it cannot constitute a contradictory prosecutorial theory of guilt, as required in *Groose*.

violation of due process, although the testimony clearly indicated that only one perpetrator had held a gun to the manager's head. *Id*. at 701-02. When the first defendant, Shaw, learned of the conviction and sentence of his accomplice three years later, he filed a habeas petition, citing the California Court of Appeals decision upholding Watts's sentence which stated: "Indeed, the evidence adduced at trial, which presumably was available to the prosecutor prior to trial, tends to support the conclusion that the jury in [Shaw's] trial was mistaken." *People v. Watts*, 76 Cal. App. 4th 1250, 1259-61 (1999) (quoted in *Shaw*, 353 F.3d at 701) (bracket added in *Shaw*).

However, the *Shaw* court distinguished its case from *Thompson*, pointing to the fact that the prosecutor did not manipulate evidence – the same crucial distinction that is present in our case. *Shaw*, 353 F.2d at 702. Ambiguous evidence is not false evidence; "regrettable" tactics are not necessarily unconstitutional. *Id*. at 703-04. The fact of the matter is that no one but Wesley and Stumpf know who shot Mrs. Stout. The State is entitled to put on the available evidence to convince the finder of fact of guilt. As long as it does so in a good faith manner, without manipulating or selecting out critical evidence, due process is not violated.

The *Shaw* court also speculated that if there were a constitutional violation, that Watts, the second defendant, rather than Shaw, would be the one who could argue the point. *Id*. at 704, n. 5. Similarly, I could understand a court accepting Wesley's claim that the prosecution could not honestly present evidence in *his* case that contradicted what the government had relied upon previously (a type of "prosecutorial estoppel"), or even that it could not present evidence that contradicted a position it was taking elsewhere. However, none of those theories can retroactively render unfair the fundamentally fair proceedings that Stumpf received.

Having indicated that I believe it is logically impossible for Stumpf's claim to succeed under these circumstances, I touch

only lightly on the court's resolution of the question of "whether there is a reasonable probability that the prosecutor's use of inconsistent, irreconcilable theories rendered the conviction unreliable." (Maj. Op. at 40). Nothing that occurred in Stumpf's proceeding rendered the conviction unreliable. At most, the *existence* of Eastman's statement could be argued to have rendered the conviction unreliable, but then our analysis would simply be that of any newly discovered evidence, which proceeds against a more difficult background and which the court does not undertake. *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986) ("Motions for a new trial based on newly discovered evidence are disfavored."); *see, e.g., Herrera v. Collins*, 506 U.S. 390, 400 (1993) (stating the rule that habeas relief is not the proper remedy for a claim of judicial error based on newly discovered evidence, absent some constitutional flaw in the trial proceedings). It would indeed be bizarre if Eastman's statement could not undermine Stumpf's conviction by its own force, but introducing it into another proceeding could do so. Following our court's decision, a prosecutor faced with the same dilemma in the future would be well advised not only to eschew reliance upon such potentially contradictory evidence in later proceedings, but presumably prevent any other prosecutor from doing so. He or she might even be forced deceitfully to disclaim a belief that a jury was entitled to hear such evidence. In sum, whatever the result might be were Wesley bringing the claim, I cannot agree to the principle of retroactive unconstitutionality propounded in this case.

## II

With respect to Stumpf's claim attacking his guilty plea, the court's opinion appears to take no notice of the benefit that Stumpf in fact gained from pleading guilty. He first waived a jury trial, opting to contest the charges before a three-judge panel. He then pled guilty in return for the prosecution dropping some charges and specifications. It is axiomatic that acceptance of responsibility decreases the chances that the death penalty will be imposed. The

sentencing court had three choices in sentencing Stumpf: life without parole for twenty years; life without parole for thirty years; and death. It made sound strategic sense for him to act in a way that would encourage the judges to choose one of the first two options.

Once Stumpf pled guilty, he was entitled to an evidentiary hearing before a three-judge panel to confirm that the evidence in the case supported his plea. Ohio Rev. Code Ann. § 2945.06. Under one strategic view of the facts, the panel might have been less likely than a jury to render a death verdict because it would have grasped the legal theory behind Stumpf's position that, while guilty of Mrs. Stout's murder, he was not actually the shooter, and therefore did not deserve the death penalty. Stumpf was arguably hoping for another benefit, namely the dismissal of the remaining specifications to the charges against him that made him eligible for the death penalty. In Ohio "[i]f the indictment contains one or more specifications, and a plea of guilty or no contest to the charge is accepted, the court may dismiss the specifications and impose sentence accordingly, in the interests of justice." Ohio R. Crim. P. 11(C)(3). Therefore, the majority is incorrect that Stumpf received no benefit at all from pleading guilty: he significantly improved his chances to avoid the death penalty, although in the end his strategy did not yield the desired result.

Despite the court's extensive exegesis of the "confusion" at the plea hearing itself, the events that took place at the sentencing hearing apparently were neither a surprise nor a disappointment, in the beginning, to the defendant or his counsel. In fact, the defense attorney stated that the prosecution's rendition of the plea agreement was accurate, (Maj. Op. at 16). No objection was made to the course of the sentencing hearing, nor was there any effort to withdraw the guilty plea at that point. It was only after the Eastman statement came to light that Stumpf attempted to withdraw his guilty plea. Similarly, at the "factual basis hearing" before the three-judge panel the defense did not attempt to say: "Wait a minute, we aren't able to make an argument that we

thought we would be able to make at this stage." It made the argument. The three-judge panel heard and considered it. They simply were not persuaded.

Finally, it is true that Stumpf denied that he actually shot Mrs. Stout. Nevertheless, he knew that by pleading guilty, he would only be able to argue that Wesley in fact committed the murder as part of the mitigation phase of the proceedings. The majority asserts that there is evidence of a "serious misunderstanding," (Maj. Op. at 23), between the judge and Stumpf's lawyers. But no one was denying that Stumpf was involved in the murder of Mrs. Stout. His lawyers were laying the groundwork to argue that Stumpf was not the triggerman and therefore did not deserve the death penalty. Stumpf would certainly be anxious to make that argument, and it is hardly surprising that, not knowing the precise point in the proceedings that it would be relevant, he would want to double-check that he would have an opportunity to argue this mitigating factor. The majority simply misinterprets Stumpf's caution as confusion.

Under these circumstances, it appears to me that Stumpf understood his legal strategy, executed it according to plan, and got exactly the opportunities that he bargained for, making the grant of a writ of habeas corpus unwarranted. Therefore, I respectfully dissent.