(Slip Opinion)     OCTOBER TERM, 2004     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BRADSHAW, WARDEN *v.* STUMPF

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 04–637.   Argued April 19, 2005—Decided June 13, 2005

Respondent Stumpf and his accomplice Wesley committed an armed robbery that left Mr. Stout wounded and Mrs. Stout dead. Stumpf admitted shooting Mr. Stout but has always denied killing Mrs. Stout. In Ohio state court proceedings, Stumpf pleaded guilty to, among other things, aggravated murder and one of three capital murder specifications charged in his indictment. This left Stumpf eligible for the death penalty. In a contested penalty hearing before a three-judge panel, Stumpf's principal mitigation arguments were that he had participated in the robbery at Wesley's urging, that Wesley had killed Mrs. Stout, and that Stumpf's minor role in the murder counseled against the death sentence. The State, however, claimed that Stumpf had shot Mrs. Stout, and that he therefore was the principal offender in her murder. In the alternative, the State noted that even an accomplice can be sentenced to death under Ohio law if he acted with the specific intent to cause death, and the State argued that such intent could be inferred from the circumstances of the robbery regardless of who actually shot Mrs. Stout. The panel concluded that Stumpf was the principal offender and sentenced him to death. At Wesley's subsequent jury trial, however, the State presented evidence that Wesley had admitted to shooting Mrs. Stout. But Wesley argued that the prosecutor had taken a contrary position in Stumpf's trial, and Wesley was sentenced to life in prison with the possibility of parole. After Wesley's trial, Stumpf moved to withdraw his own plea or vacate his death sentence, arguing that the evidence endorsed by the State in Wesley's trial cast doubt on Stumpf's conviction and sentence. This time, however, the prosecutor emphasized other evidence confirming Stumpf as the shooter and again raised, in the alternative, the aider-and-abettor theory. The court denied

Stumpf's motion, and Ohio's appellate courts affirmed. Subsequently, the Federal District Court denied Stumpf habeas relief, but the Sixth Circuit reversed on two grounds. First, the Sixth Circuit found that Stumpf had not understood that specific intent to cause death was a necessary element of the aggravated murder charge, and that his guilty plea therefore had not been knowing, voluntary, and intelligent. Second, the court found that the conviction and sentence could not stand because the State had secured convictions of both Stumpf and Wesley for the same crime, using inconsistent theories.

*Held:*

   1. The Sixth Circuit erred in concluding that Stumpf was uninformed of the aggravated murder charge's specific intent element. While a guilty plea is invalid if the defendant has not been informed of the crime's elements, Stumpf's attorneys represented at his plea hearing that they had explained the elements to their client, and Stumpf confirmed that the representation was true. This Court has never held that the judge must himself explain a crime's elements to the defendant. Rather, constitutional requirements may be satisfied where the record accurately reflects that the charge's nature and the crime's elements were explained to the defendant by his own, competent counsel. Stumpf argues that his plea was so inconsistent with his denial of having shot Mrs. Stout that he could only have pleaded guilty out of ignorance of the aggravated murder charge's specific intent element. But that argument fails because Stumpf's conviction did not require a showing that Stumpf had shot Mrs. Stout. Ohio law also considers aiders and abettors who act with specific intent to cause death liable for aggravated murder. Stumpf and Wesley entered the Stout home with guns, intending to commit armed robbery, and Stumpf admitted shooting Mr. Stout. Taken together, these facts could show that the two men had agreed to kill both Stouts, which in turn could make both men guilty of aggravated murder regardless of who shot Mrs. Stout. Stumpf's claim that he and his attorneys were confused about the relevance and timing of defenses that they planned to make is not supported by the record. Finally, the plea's validity may not be collaterally attacked on the ground that Stumpf made what he now claims was a bad deal. Pp. 6–10.

   2. The Sixth Circuit was also wrong to hold that prosecutorial inconsistencies between the Stumpf and Wesley cases required voiding Stumpf's guilty plea. The precise identity of the triggerman was immaterial to Stumpf's aggravated murder conviction, and Stumpf has never explained how the prosecution's postplea use of inconsistent arguments could have affected the knowing, voluntary, and intelligent nature of his plea. P. 11.

   3. The prosecutor's use of allegedly inconsistent theories may have

a more direct effect on Stumpf's sentence, however, for it is arguable that the sentencing panel's conclusion about his role was material to its sentencing determination. The opinion below leaves some ambiguity as to the overlap between how the lower court resolved Stumpf's due process challenge to his conviction and how it resolved his challenge to his sentence. It is not clear whether the Court of Appeals would have found Stumpf entitled to resentencing had it not also considered the conviction invalid. Likewise, the parties' briefing here, and the question on which this Court granted certiorari, largely focused on the conviction. In these circumstances, it would be premature for this Court to resolve the merits of Stumpf's sentencing claim before giving the Sixth Circuit the opportunity to consider in the first instance the question of how the prosecutor's conduct in the Stumpf and Wesley cases related to Stumpf's death sentence in particular. Pp. 11–12.

367 F. 3d 594, reversed in part, vacated in part, and remanded.

O'CONNOR, J., delivered the opinion for a unanimous Court. SOUTER, J., filed a concurring opinion in which GINSBURG, J., joined. THOMAS, J., filed a concurring opinion, in which SCALIA, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–637

MARGARET BRADSHAW, WARDEN, PETITIONER *v.* JOHN DAVID STUMPF

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 13, 2005]

JUSTICE O'CONNOR delivered the opinion of the Court.

This case concerns respondent John David Stumpf's conviction and death sentence for the murder of Mary Jane Stout. In adjudicating Stumpf's petition for a writ of habeas corpus, the United States Court of Appeals for the Sixth Circuit granted him relief on two grounds: that his guilty plea was not knowing, voluntary, and intelligent, and that his conviction and sentence could not stand because the State, in a later trial of Stumpf's accomplice, pursued a theory of the case inconsistent with the theory it had advanced in Stumpf's case. We granted certiorari to review both holdings. 543 U. S. \_\_\_ (2005).

I

On May 14, 1984, Stumpf and two other men, Clyde Daniel Wesley and Norman Leroy Edmonds, were traveling in Edmonds' car along Interstate 70 through Guernsey County, Ohio. Needing money for gas, the men stopped the car along the highway. While Edmonds waited in the car, Stumpf and Wesley walked to the home of Norman and Mary Jane Stout, about 100 yards away. Stumpf and Wesley, each concealing a gun, talked their way into the

home by telling the Stouts they needed to use the phone. Their real object, however, was robbery: Once inside, Stumpf held the Stouts at gunpoint, while Wesley ransacked the house. When Mr. Stout moved toward Stumpf, Stumpf shot him twice in the head, causing Mr. Stout to black out. After he regained consciousness, Mr. Stout heard two male voices coming from another room, and then four gunshots—the shots that killed his wife. Edmonds was arrested shortly afterward, and his statements led the police to issue arrest warrants for Stumpf and Wesley. Stumpf, who surrendered to the police, at first denied any knowledge of the crimes. After he was told that Mr. Stout had survived, however, Stumpf admitted to participating in the robbery and to shooting Mr. Stumpf. But he claimed not to have shot Mrs. Stout, and he has maintained that position ever since.

The proceedings against Stumpf occurred while Wesley, who had been arrested in Texas, was still resisting extradition to Ohio. Stumpf was indicted for aggravated murder, attempted aggravated murder, aggravated robbery, and two counts of grand theft. With respect to the aggravated murder charge, the indictment listed four statutory "specifications"—three of them aggravating circumstances making Stumpf eligible for the death penalty. See App. 117–118; Ohio Rev. Code Ann. §2929.03 (Anderson 1982).* The case was assigned to a three-judge panel in the Court of Common Pleas.

Rather than proceed to trial, however, Stumpf and the State worked out a plea agreement: Stumpf would plead guilty to aggravated murder and attempted aggravated murder, and the State would drop most of the other charges; with respect to the aggravated murder charge,

—————

*Unless otherwise noted, all citations to Ohio statutes refer to the versions of those statutes in effect in 1984, at the time of the crime and trial.

Stumpf would plead guilty to one of the three capital specifications, with the State dropping the other two. The plea was accepted after a colloquy with the presiding judge, and after a hearing in which the panel satisfied itself as to the factual basis for the plea.

Because the capital specification to which Stumpf pleaded guilty left him eligible for the death penalty, a contested penalty hearing was held before the same three-judge panel. Stumpf's mitigation case was based in part on his difficult childhood, limited education, dependable work history, youth, and lack of prior serious offenses. Stumpf's principal argument, however, was that he had participated in the plot only at the urging and under the influence of Wesley, that it was Wesley who had fired the fatal shots at Mrs. Stout, and that Stumpf's assertedly minor role in the murder counseled against the death sentence. See §2929.04(B)(6) (directing the sentencer to consider as a potential mitigating circumstance, "[i]f the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense"). The State, on the other hand, argued that Stumpf had indeed shot Mrs. Stout. Still, while the prosecutor claimed Stumpf's allegedly primary role in the shooting as a special reason to reject Stumpf's mitigation argument, the prosecutor also noted that Ohio law did not restrict the death penalty to those who commit murder by their own hands—an accomplice to murder could also receive the death penalty, so long as he acted with the specific intent to cause death. As a result, the State argued, Stumpf deserved death even if he had not personally shot Mrs. Stout, because the circumstances of the robbery provided a basis from which to infer Stumpf's intent to cause death. The three-judge panel, agreeing with the State's first contention, specifically found that Stumpf "was the principal offender" in the aggravated murder of Mrs. Stout. App. 196. Determining that the aggravating

factors in Stumpf's case outweighed any mitigating factors, the panel sentenced Stumpf to death.

Afterward, Wesley was successfully extradited to Ohio to stand trial. His case was tried to a jury, before the same judge who had presided over the panel overseeing Stumpf's proceedings, and with the same prosecutor. This time, however, the prosecutor had new evidence: James Eastman, Wesley's cellmate after his extradition, testified that *Wesley* had admitted to firing the shots that killed Mrs. Stout. The prosecutor introduced Eastman's testimony in Wesley's trial, and in his closing argument he argued for Wesley's credibility and lack of motive to lie. The prosecutor claimed that Eastman's testimony, combined with certain circumstantial evidence and with the implausibility of Wesley's own account of events, proved that Wesley was the principal offender in Mrs. Stout's murder—and that Wesley therefore deserved to be put to death. One way Wesley countered this argument was by noting that the prosecutor had taken a contrary position in Stumpf's trial, and that Stumpf had already been sentenced to death for the crime. Wesley also took the stand in his own defense, and testified that Stumpf had shot Mrs. Stout. In the end, the jury sentenced Wesley to life imprisonment with the possibility of parole after 20 years.

After the Wesley trial, Stumpf, whose direct appeal was still pending in the Ohio Court of Appeals, returned to the Court of Common Pleas with a motion to withdraw his guilty plea or vacate his death sentence. Stumpf argued that Eastman's testimony, and the prosecution's endorsement of that testimony in Wesley's trial, cast doubt upon Stumpf's conviction and sentence. The State (represented again by the same prosecutor who had tried both Wesley's case and Stumpf's original case) disagreed. According to the prosecutor, the court's first task was to decide whether the Eastman testimony was sufficient to alter the court's prior determination that Stumpf had been the shooter.

*Id.*, at 210. Contrary to the argument he had presented in the Wesley trial, however, the prosecutor now noted that Eastman's testimony was belied by certain other evidence (ballistics evidence and Wesley's testimony in his own defense) confirming Stumpf to have been the primary shooter. In the alternative, the State noted as it had before that an aider-and-abettor theory might allow the death sentence to be imposed against Stumpf even if he had not shot Mrs. Stout.

Although one judge speculated during oral argument that the court's earlier conclusion about Stumpf's principal role in the killing "may very well have had an effect upon" the prior sentencing determination, *ibid.*, the Court of Common Pleas denied Stumpf's motion in a brief summary order without explanation. That order was appealed together with the original judgment in Stumpf's case, and the Ohio Court of Appeals affirmed, as did the Ohio Supreme Court. *State* v. *Stumpf,* 32 Ohio St. 3d 95, 512 N. E. 2d 598 (1987), cert. denied, 484 U. S. 1079 (1988).

After a subsequent request for state postconviction relief was denied by the state courts, Stumpf filed this federal habeas petition in the United States District Court for the Southern District of Ohio in November 1995. The District Court denied Stumpf relief, but granted permission to appeal on four claims, including the two at issue here. The United States Court of Appeals for the Sixth Circuit reversed, concluding that habeas relief was warranted on "either or both" of "two alternative grounds." *Stumpf* v. *Mitchell,* 367 F. 3d 594, 596 (2004). First, the court determined that Stumpf's guilty plea was invalid because it had not been entered knowingly and intelligently. More precisely, the court concluded that Stumpf had pleaded guilty to aggravated murder without understanding that specific intent to cause death was a necessary element of the charge under Ohio law. See Ohio Rev. Code Ann. §§2903.01(B) and (D). Noting that Stumpf had all along

denied shooting Mrs. Stout, and considering those denials inconsistent with an informed choice to plead guilty to aggravated murder, the Court of Appeals concluded that Stumpf must have entered his plea out of ignorance. Second, the court concluded that "Stumpf's due process rights were violated by the state's deliberate action in securing convictions of both Stumpf and Wesley for the same crime, using inconsistent theories." 367 F. 3d, at 596. This violation, the court held, required setting aside "both Stumpf's plea and his sentence." *Id.,* at 616. One member of the panel dissented.

## II

Because Stumpf filed his habeas petition before enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we review his claims under the standards of the pre-AEDPA habeas statute. See *Lindh* v. *Murphy,* 521 U. S. 320 (1997). Moreover, because petitioner has not argued that Stumpf's habeas claims were barred as requiring announcement of a new rule, we do not apply the rule of *Teague* v. *Lane,* 489 U. S. 288 (1989), to this case. See *Schiro* v. *Farley,* 510 U. S. 222, 229 (1994); *Godinez* v. *Moran,* 509 U. S. 389, 397, n. 8 (1993).

## A

The Court of Appeals concluded that Stumpf's plea of guilty to aggravated murder was invalid because he was not aware of the specific intent element of the charge—a determination we find unsupportable.

Stumpf's guilty plea would indeed be invalid if he had not been aware of the nature of the charges against him, including the elements of the aggravated murder charge to which he pleaded guilty. A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, "with sufficient awareness of the relevant circumstances and likely consequences."

*Brady* v. *United States,* 397 U. S. 742, 748 (1970). Where a defendant pleads guilty to a crime without having been informed of the crime's elements, this standard is not met and the plea is invalid. *Henderson* v. *Morgan,* 426 U. S. 637 (1976).

But the Court of Appeals erred in finding that Stumpf had not been properly informed before pleading guilty. In Stumpf's plea hearing, his attorneys represented on the record that they had explained to their client the elements of the aggravated murder charge; Stumpf himself then confirmed that this representation was true. See App. 135, 137–138. While the court taking a defendant's plea is responsible for ensuring "a record adequate for any review that may be later sought," *Boykin* v. *Alabama,* 395 U. S. 238, 244 (1969), we have never held that the judge must himself explain the elements of each charge to the defendant on the record. Rather, the constitutional prerequisites of a valid plea may be satisfied where the record accurately reflects that the nature of the charge and the elements of the crime were explained to the defendant by his own, competent counsel. Cf. *Henderson*, *supra,* at 647 (granting relief to a defendant unaware of the elements of his crime, but distinguishing that case from others where "the record contains either an explanation of the charge by the trial judge, or at least a representation by defense counsel that the nature of the offense has been explained to the accused"). Where a defendant is represented by competent counsel, the court usually may rely on that counsel's assurance that the defendant has been properly informed of the nature and elements of the charge to which he is pleading guilty.

Seeking to counter this natural inference, Stumpf argues, in essence, that his choice to plead guilty to the aggravated murder charge was so inconsistent with his denial of having shot the victim that he could only have pleaded guilty out of ignorance of the charge's specific intent re-

quirement. But Stumpf's asserted inconsistency is illusory. The aggravated murder charge's intent element did not require any showing that Stumpf had himself shot Mrs. Stout. Rather, Ohio law considers aiders and abettors equally in violation of the aggravated murder statute, so long as the aiding and abetting is done with the specific intent to cause death. See *In re Washington,* 81 Ohio St. 3d 337, 691 N. E. 2d 285 (1998); *State* v. *Scott,* 61 Ohio St. 2d 155, 165, 400 N. E. 2d 375, 382 (1980). As a result, Stumpf's steadfast assertion that he had not shot Mrs. Stout would not necessarily have precluded him from admitting his specific intent under the statute.

That is particularly so given the other evidence in this case. Stumpf and Wesley had gone to the Stouts' home together, carrying guns and intending to commit armed robbery. Stumpf, by his own admission, shot *Mr.* Stout in the head at close range. Taken together, these facts could show that Wesley and Stumpf had together agreed to kill both of the Stouts in order to leave no witnesses to the crime. And that, in turn, could make both men guilty of aggravated murder regardless of who actually killed Mrs. Stout. See *ibid.,* at 165, 400 N. E. 2d, at 382.

Stumpf also points to aspects of the plea hearing transcript which he says show that both he and his attorneys were confused about the relevance and timing of defenses Stumpf and his attorneys had planned to make. First, at one point during the hearing, the presiding judge stated that by pleading guilty Stumpf would waive his trial rights and his right to testify in his own behalf. Stumpf's attorney answered that Stumpf "was going to respond but we have informed him that there is, after the plea, a hearing or trial relative to the underlying facts so that he is of the belief that there will be a presentation of evidence." App. 140. The presiding judge responded that "[o]f course in the sentencing portion of this trial you do have those rights to speak in your own behalf [and] to present evi-

dence and testimony on your own behalf." *Ibid.* A few moments later, there was another exchange along similar lines, after the judge asked Stumpf whether he was "in fact guilty of" the aggravated murder charge and its capital specification:

> "[DEFENSE COUNSEL]: . . . Your Honor, the defendant has asked me to explain his answer. His answer is yes. He will recite that with obviously his understanding of his right to present evidence at a later time relative to his conduct, but he'll respond to that.

> "JUDGE HENDERSON: At no time am I implying that the defendant will not have the right to present evidence in [the] mitigation hearing . . . . And I'm going to ask that the defendant, himself, respond to the question that I asked with that understanding that he has the right to present evidence in mitigation. I'm going to ask the defendant if he is in fact guilty of the charge set forth in Count one, including specification one . . . ?

> "THE DEFENDANT: Yes, sir." *Id.*, at 142.

Reviewing this exchange, the Court of Appeals concluded that Stumpf "obviously . . . was reiterating his desire to challenge the [S]tate's account of his actions"—that is, to show that he did not intend to kill Mrs. Stout. 367 F. 3d, at 607. But the desire to contest the State's version of events would not necessarily entail the desire to contest the aggravated murder charge or any of its elements. Rather, Stumpf's desire to put on evidence "relative to the underlying facts" and "relative to his conduct" could equally have meant that Stumpf was eager to make his mitigation case—an interpretation bolstered by the attorney's and Stumpf's approving answers after the presiding judge confirmed that the defense could put on evidence "in mitigation" and in "the sentencing" phase. While Stumpf's mitigation case was premised on the argument

that Stumpf had not shot Mrs. Stout, that was fully con-
sistent with his plea of guilty to aggravated murder. See
*supra,* at 7–8.

Finally, Stumpf, like the Court of Appeals, relies on the
perception that he obtained a bad bargain by his plea—
that the State's dropping several non-murder charges and
two of the three capital murder specifications was a bad
tradeoff for Stumpf's guilty plea. But a plea's validity may
not be collaterally attacked merely because the defendant
made what turned out, in retrospect, to be a poor deal.
See *Brady,* 397 U. S., at 757; *Mabry* v. *Johnson,* 467 U. S.
504, 508 (1984). Rather, the shortcomings of the deal
Stumpf obtained cast doubt on the validity of his plea only
if they show either that he made the unfavorable plea on
the constitutionally defective advice of counsel, see *Tollett*
v. *Henderson,* 411 U. S. 258, 267 (1973), or that he could not
have understood the terms of the bargain he and Ohio
agreed to. Though Stumpf did bring an independent claim
asserting ineffective assistance of counsel, that claim is
not before us in this case. And in evaluating the validity
of Stumpf's plea, we are reluctant to accord much weight
to his *post hoc* reevaluation of the wisdom of the bargain.
Stumpf pleaded guilty knowing that the State had copious
evidence against him, including the testimony of Mr.
Stout; the plea eliminated two of the three capital specifi-
cations the State could rely on in seeking the death pen-
alty; and the plea allowed Stumpf to assert his acceptance
of responsibility as an argument in mitigation. Under
these circumstances, the plea may well have been a know-
ing, voluntary, and intelligent reaction to a litigation
situation that was difficult, to say the least. The Court of
Appeals erred in concluding that Stumpf was uninformed
about the nature of the charge he pleaded guilty to, and
we reverse that portion of the judgment below.

B

The Court of Appeals was also wrong to hold that prosecutorial inconsistencies between the Stumpf and Wesley cases required voiding Stumpf's guilty plea. Stumpf's assertions of inconsistency relate entirely to the prosecutor's arguments about which of the two men, Wesley or Stumpf, shot Mrs. Stout. For the reasons given above, see *supra,* at 7–8, the precise identity of the triggerman was immaterial to Stumpf's conviction for aggravated murder. Moreover, Stumpf has never provided an explanation of how the prosecution's postplea use of inconsistent arguments could have affected the knowing, voluntary, and intelligent nature of his plea.

The prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence, however, for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination. The opinion below leaves some ambiguity as to the overlap between how the lower court resolved Stumpf's due process challenge to his conviction, and how it resolved Stumpf's challenge to his sentence. It is not clear whether the Court of Appeals would have concluded that Stumpf was entitled to resentencing had the court not also considered the conviction invalid. Likewise, the parties' briefing to this Court, and the question on which we granted certiorari, largely focused on the lower court's determination about Stumpf's conviction. See, *e.g.,* Pet. for Cert. ii (requesting review of Stumpf's *conviction*, not sentence); Reply Brief for Petitioner 3 (challenge to Court of Appeals' decision is focused on issue of conviction); Brief for Respondent 15, n. 3 ("arguments regarding Stumpf's death sentence are not before this Court"). In these circumstances, it would be premature for this Court to resolve the merits of Stumpf's sentencing claim, and we therefore express no opinion on whether the prosecutor's actions

amounted to a due process violation, or whether any such
violation would have been prejudicial. The Court of Ap-
peals should have the opportunity to consider, in the first
instance, the question of how Eastman's testimony and
the prosecutor's conduct in the Stumpf and Wesley cases
relate to Stumpf's death sentence in particular. Accord-
ingly, we vacate the portion of the judgment below relat-
ing to Stumpf's prosecutorial inconsistency claim, and we
remand the case for further proceedings consistent with
this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 04–637

MARGARET BRADSHAW, WARDEN, PETITIONER *v.*
JOHN DAVID STUMPF

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 13, 2005]

JUSTICE SOUTER, joined by JUSTICE GINSBURG, concurring.

I join the opinion of the Court and add this word to explain the issue that I understand we are remanding for further consideration. As the Court notes in its opinion, although respondent John Stumpf challenged both his conviction and his death sentence, his attack on the sentence was not always distinct from the issue raised about the conviction.

I understand Stumpf to claim that it violates the basic due process standard, barring fundamentally unfair procedure, to allow his death sentence to stand in the aftermath of three positions taken by the State: (1) at Stumpf's sentencing hearing; (2) at the trial of Stumpf's codefendant, Clyde Wesley; and (3) in response to Stumpf's motion to withdraw his guilty plea in light of the State's position at the Wesley trial. At the hearing on Stumpf's sentence, the State argued that he was the triggerman, and it urged consideration of that fact as a reason to impose a death sentence. App. 186, 188–189. The trial court found that Stumpf had pulled the trigger and did sentence him to death, though it did not state that finding Stumpf to be the shooter was dispositive in determining the sentence. App. to Pet. for Cert. 219a. After the sentencing proceeding was over, the State tried the codefendant,

Wesley, and on the basis of testimony from a new witness argued that Wesley was in fact the triggerman, App. 282, and should be sentenced to death. The new witness was apparently unconvincing to the jury, which in any event was informed that Stumpf had already been sentenced to death for the crime; the jury rejected the specification that named Wesley as the triggerman, and it recommended a sentence of life, not death. Stumpf then challenged his death sentence (along with his conviction) on the basis of the prosecution's position in the Wesley case. In response, the State did not repudiate the position it had taken in the codefendant's case, or explain that it had made a mistake there. Instead, it merely dismissed the testimony of the witness it had vouched for at Wesley's trial, *id.*, at 125, and maintained that Stumpf's death sentence should stand for some or all of the reasons it originally argued for its imposition. At the end of the day, the State was on record as maintaining that Stumpf and Wesley should both be executed on the ground that each was the triggerman, when it was undisputed that only one of them could have been.

Stumpf's claim as I understand it is not a challenge to the evidentiary basis for arguing for the death penalty in either case; nor is it a claim that the prosecution deliberately deceived or attempted to deceive either trial court, as in *Mooney* v. *Holohan*, 294 U. S. 103 (1935) *(per curiam)*; nor does it implicate the rule that inconsistent jury verdicts may be enforced, *United States* v. *Powell*, 469 U. S. 57 (1984); *Dunn* v. *United States*, 284 U. S. 390 (1932). As I see it, Stumpf's argument is simply that a death sentence may not be allowed to stand when it was imposed in response to a factual claim that the State necessarily contradicted in subsequently arguing for a death sentence in the case of a codefendant. Stumpf's position was anticipated by JUSTICE STEVENS's observation 10 years ago that "serious questions are raised when the sovereign itself

takes inconsistent positions in two separate criminal proceedings against two of its citizens," and that "the heightened need for reliability in capital cases only underscores the gravity of those questions . . . ." *Jacobs* v. *Scott*, 513 U. S. 1067, 1070 (1995) (citation and internal quotation marks omitted). JUSTICE STEVENS's statement in turn echoed the more general one expressed by Justice Sutherland in *Berger* v. *United States*, 295 U. S. 78, 88 (1935), that the State's interest in winning some point in a given case is transcended by its interest "that justice shall be done." Ultimately, Stumpf's argument appears to be that sustaining a death sentence in circumstances like those here results in a sentencing system that invites the death penalty "to be . . . wantonly and . . . freakishly imposed." *Lewis* v. *Jeffers*, 497 U. S. 764, 774 (1990) (quoting *Gregg* v. *Georgia*, 428 U. S. 153, 188 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) (internal quotation marks omitted)).

If a due process violation is found in the State's maintenance of such inconsistent positions, there will be remedial questions. May the death sentence stand if the State declines to repudiate its inconsistent position in the codefendant's case? Would it be sufficient simply to reexamine the original sentence and if so, which party should have the burden of persuasion? If more would be required, would a *de novo* sentencing hearing suffice?

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–637

———————

## MARGARET BRADSHAW, WARDEN, PETITIONER *v.* JOHN DAVID STUMPF

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 13, 2005]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring.

I join the Court's opinion. As the Court notes, the State has not argued that *Teague* v. *Lane,* 489 U. S. 288 (1989), forecloses Stumpf's claim that the prosecution's presentation of inconsistent theories violated his right to due process. *Ante*, at 6. With certain narrow exceptions, *Teague* precludes federal courts from granting habeas petitioners relief on the basis of "new" rules of constitutional law established after their convictions become final. 489 U. S., at 310 (plurality opinion). This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories. Moreover, it is "[a] threshold question in every habeas case . . . whether the court is obligated to apply the *Teague* rule to the defendant's claim," and "if the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply *Teague* before considering the merits of the claim." *Horn* v. *Banks,* 536 U. S. 266, 271 (2002) *(per curiam)* (internal quotation marks omitted). The State also has not argued that Stumpf procedurally defaulted his due process claim, even though it appears that Stumpf never presented this argument to the Ohio courts. Stumpf did not even raise

the inconsistent-theories claim in his first federal habeas filings. See App. to Pet. for Cert. 134a–140a. Instead, the District Court raised the issue for Stumpf *sua sponte*, and ordered supplemental briefing on the point. See App. 97–98. The Court's opinion does not preclude the State from advancing either of these procedural defenses on remand in support of Stumpf's death sentence.

Moreover, I agree with the Court that "Stumpf has never provided an explanation of how the prosecution's postplea use of inconsistent arguments could have affected the knowing, voluntary, and intelligent nature of his plea." *Ante*, at 11. Similar reasoning applies to Stumpf's sentence. Stumpf equally has never explained how the prosecution's use of postsentence inconsistent arguments— which were based on evidence unavailable until after Stumpf was sentenced—could have affected the reliability or procedural fairness of his death sentence. At most, the evidence and purportedly inconsistent theory presented at Wesley's trial would constitute newly discovered evidence casting doubt on the reliability of Stumpf's death sentence, a sort of claim that our precedents and this Nation's traditions have long foreclosed, see *Herrera* v. *Collins,* 506 U. S. 390, 408–417 (1993); *id.*, at 427–428 (SCALIA, J., concurring). The Bill of Rights guarantees vigorous adversarial testing of guilt and innocence and conviction only by proof beyond a reasonable doubt. These guarantees are more than sufficient to deter the State from taking inconsistent positions; a prosecutor who argues inconsistently risks undermining his case, for opposing counsel will bring the conflict to the factfinder's attention. See *ante*, at 2 (SOUTER, J., concurring) (noting that Wesley's jury was informed that Stumpf had already been sentenced to death for the crime).